**RHODE ISLAND BROTHERHOOD OF CORRECTIONAL OFFICERS**

v.

**STATE of Rhode Island DEPARTMENT OF CORRECTIONS.**

No. 96–240–Appeal.

Supreme Court of Rhode Island.

Jan. 15, 1998.

John A. McFadyen, 3rd., Gerard P. Cobleigh, Warwick, Jean Rosiello, for Plaintiff.

Joseph S. Larisa, Jr., William E. Smith, Providence, for Defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS and GOLDBERG, JJ.

## OPINION

FLANDERS, Justice.

■ Can the state take steps to withhold approval of certain union members' requests to take paid leaves from their state jobs to work full time on union business? Can it do so without resort to collective bargaining and notwithstanding the state's past practice of approving such requests? Given the circumstances presented by this appeal, we answer these questions in the affirmative.

Over the years the State of Rhode Island (state) Department of Corrections (DOC) has engaged in a practice of approving various employees' requests to take paid leave from their government jobs to work on union business. In more recent years this past practice had grown to the point where, in addition to approving requests for employees to take as-needed paid leaves to pursue sundry union interests, DOC was paying as many as five of its government employees to work full time on union matters. The legal issue raised by this appeal is whether an arbitrator can bar the state's attempt to squelch this past practice without using the collective bargaining process to do so. An arbitrator ruled (and the Superior Court later confirmed) that a DOC director's unwritten agreement to allow DOC employees to take up to 160 hours per week to work full time on union business, coupled with the existence of the DOC's past

practice of allowing paid full-time union leave, precludes any effort by the state to change this practice unilaterally. For the reasons set forth below, we reverse and vacate both the arbitration award and the Superior Court's confirmatory judgment.

## I

### Facts and Travel

On appeal the state seeks to overturn a Superior Court judgment confirming an arbitrator's award in favor of certain DOC employees who are represented by the Rhode Island Brotherhood of Correctional Officers (the union). The arbitrator found that a particular memorandum issued by Lincoln Almond, the present Governor of Rhode Island (Governor or Governor Almond), together with implementing guidelines, unlawfully attempted to effect a unilateral change in the collective-bargaining agreement (CBA) between DOC and the union. The union claims that several CBA provisions prevent the state from changing DOC's past practices with respect to approving requests for paid union leave, including its past practice of approving requests for a certain number of union employees to work full time on union business while they are still being paid by the state (paid full-time union leave). The union argued, and the arbitrator agreed, that the Governor's unilateral attempt to eliminate this past practice violated the applicable CBA. The background for this dispute follows.

On December 29, 1994, the state and the union entered into a CBA for the period 1994 through 1996. The state signatories to the CBA were Governor Almond's predecessor, former Governor Bruce Sundlun,[1] and various other executive department officials who were members of the Sundlun administration, including the director of administration, the DOC director, and the state's labor relations administrator. The union's president, its attorney, and its first vice president signed for the union. Among other terms, this CBA contained several provisions rele-

vant to the issue of paid union leave for DOC employees:

**Article 4.1:** "The Brotherhood recognizes that except as limited, abridged, or relinquished by the terms and provisions of this Agreement, the right to manage, direct, or supervise the operations of the State and the employees is vested solely in the State.

For example, the employer shall have the exclusive right, subject to the provisions of this Agreement and consistent with applicable laws and regulations:

 A. To direct employees in the performance of official duties;

\* \* \*

 E. To relieve employees from duties because of lack of work or for other legitimate reasons."

**Article 15.1:** "[Employees] shall be granted time off with pay during working hours to investigate and seek to settle grievances, to attend hearings, meetings, conferences relating to union business and contract negotiations with State officials. Such time shall be granted with the approval of the Department director or his designee, which said approval shall not be unreasonably withheld."

**Article 32.1:** "It is hereby agreed that any alteration or modification of this Agreement shall be binding upon the parties hereto only if executed in writing."

**Article 35.5:** "Except as otherwise expressly provided herein, all privileges and benefits which employees have hereto enjoyed shall be maintained and continued by the State during the term of this Agreement."

On March 27, 1995, Governor Almond issued a memorandum stating that "certain reasonable procedures" were to be followed before any employees of the various state departments and agencies (including DOC employees) would be allowed to take paid union leave. Thereafter on or about May 19, 1995, the executive department published and distributed guidelines implementing the earlier gubernatorial memorandum. The

---

1. In November of 1994 Governor Almond was elected to a four-year term beginning January 1995.

guidelines contained "examples of activities that would normally not be approved for union business release time with pay" under the CBA. Included among the examples cited were some union-related activities that in the past had been approved for union-business-release time. The union responded by filing a grievance and requesting arbitration.

On August 28, 1995, an arbitrator sustained the union's grievance and determined that the state—by means of the Governor's memorandum and implementing guidelines—had violated the CBA by attempting to alter its terms unilaterally. First, he found that the meaning of CBA article 15.1 was clear and unambiguous and expressly permitted paid union leave. Second, the arbitrator concluded that the Governor's memorandum and guidelines attempted to alter the practices and procedures that were protected by article 35.5, the CBA's "privileges and benefits" clause. Specifically the arbitrator found that DOC's past practices with respect to allowing paid union leave had been in place for more than twenty years and that since January 1991 the DOC had agreed to allow a minimum of four and a maximum of five union officials to perform paid full-time union work on a daily basis. Moreover, he found that in January 1994 the DOC director had entered into an unwritten agreement with the union allowing employees to take full-time paid union leave for up to a maximum of 160 hours per week. The existence of these unwritten but agreed-upon practices, according to the arbitrator, validated the union's contention that the CBA's provision for paid union leave (article 15.1), together with the privileges-and-benefits clause (article 35.5), precluded the Governor's 1995 actions whereby he had attempted to alter these past practices unilaterally.[2] Accordingly the arbitrator ordered the state (1) to cease and desist from enforcing these unilateral changes and (2) to restore paid union leave time lost during the state's attempted imposition of these changes.

On September 8, 1995, the union asked the Superior Court to confirm the arbitrator's award. Shortly thereafter, the state moved for a stay pending a hearing on its own motion to vacate the award. However, instead of ruling on the state's motion to stay, the court opted to confirm the arbitrator's award and to deny the state's motion to vacate. In sum the court agreed with the arbitrator that DOC's past practices with respect to allowing paid union leave—practices that were still being followed at the time of the Governor's 1995 memorandum and guidelines—satisfied the "past practices" criteria laid out in *Rhode Island Court Reporters Alliance v. State*, 591 A.2d 376, 378–79 (R.I.1991) (the *Court Reporters* case) (announcing five criteria for determining whether evidence exists of the parties' mutual intent to adopt a past practice as binding). As a result the court confirmed the arbitrator's ruling that DOC's past practice of granting paid full-time union leave had attained the status of an enforceable privilege and benefit under article 35.5 of the CBA.

Second, the Superior Court rejected the state's argument that the Governor's attempts to change these past practices and to curb paid full-time union leave were included within those management rights reserved to the state under article 4.1 of the CBA. It concluded that the state's article 4.1 management rights were limited and abridged by the CBA provisions allowing paid union leave and continuing any privileges and benefits previously enjoyed by DOC employees. Third, the court found that the language of article 4.1 detailing management's reserved rights did not directly authorize its claimed entitlement to refuse approval for paid union leave. Finally, the Superior Court rejected the state's argument that the arbitration award should be vacated because the award violated the Rhode Island Labor Relations Act, G.L.1956 § 28–7–13(3)(iii) (declaring employer compensation for union work to be an unfair labor practice unless it is restricted to time spent conferring with the employer dur-

---

**2.** The arbitrator concluded, "Twenty-three years of experience under these articles has given rise to a significant number of mutually agreed and accepted practices which both assist in the interpretation of Article 15 and constitute independent 'privileges and benefits' within the meaning of Article 35."

ing working hours).[3]

Because of § 28–7–2(e)'s pronouncement that "[a]ll the provisions of this chapter shall be liberally construed for the accomplishment of [the statute's stated] purpose[s]," the Superior Court construed § 28–7–13(3) liberally in favor of the union and determined that DOC's past practices with respect to allowing paid union leave were not inconsistent with the language and policy of this statute.

On appeal the state contends that the arbitration award should be vacated because the arbitrator exceeded his powers and the Superior Court erred in confirming such an award. First, it argues that the arbitrator should not have converted DOC's past practice of permitting, *inter alia*, paid full-time union leave for certain of its employees into a contractually enforceable privilege and benefit. It contends that such a ruling contravenes § 28–7–13(3)'s plain and unequivocal language precluding the state from compensating government employees for such work—especially when the statute's one exception (restricting employees' paid time off for union business to situations in which they confer with the state as employer) is plainly not applicable to employees who are on paid full-time union leave. Next the state contends that the award is in manifest disregard of the CBA's express provisions allowing the state reasonably to withhold approval of paid-union-leave requests.

In response the union argues that paid union leave is permitted by the CBA's broad terms, that these terms were negotiated at arm's length, and that the Governor's executive memorandum and implementation guidelines are at variance with the parties' past practices and, therefore, with the CBA. The union further contends that § 28–7–13(3)

"has absolutely nothing to do with a union leave provision" and that the state has inappropriately "pulled [the statute] out of the deep freeze [and] out of comfortable retirement." Moreover, it argues that the statute is inapplicable because, having bargained for the inclusion of a clause in the CBA that would allow for paid full-time union leave, the state should not now be heard to claim that such a provision constitutes a forbidden voluntary "contribution" in violation of the statutory bar on an employer's compensating its employees for union work (other than for time spent conferring with the state). We proceed below to address these and the other issues raised by this appeal.

## II

### Analysis

We begin our analysis by observing that although the CBA was the product of bargaining and negotiation between the state and the union, the terms of the CBA itself do not directly address the precise legal questions raised by this appeal. A review of the CBA's plain language reveals the following: (1) requests for paid union leave under article 15.1 are not entitled to be approved as a matter of right but require employees to obtain the DOC director's approval; (2) although such approval may not be unreasonably withheld, the converse is also true—the CBA contemplates that such approval can be reasonably withheld; (3) the reasonable bases for withholding such approval are not specified in the CBA but presumably would and could include reasons related to the state's reserved "right to manage, direct, or supervise the operations of the State and the [DOC] employees" and "[t]o direct [DOC] employees in the performance of official

**3.** *"It shall be an unfair labor practice for an employer:* * * * *(3) To dominate or interfere with the formation, existence, or administration of any employee organization or association, agency, or plan which exists in whole or in part for the purpose of dealing with employers concerning terms or conditions of employment, labor disputes, or grievances, or to contribute financial or other support to any such organization, by any means, including, but not limited to the following:* * * * *(iii) By compensating any employee or individual for services* performed in behalf of any employee organization or association,* agency or plan, or by donating free services, equipment, materials, office or meeting space, or any thing else of value for the use of any employee organization or association, agency, or plan; *provided that an employer shall not be prohibited from permitting employees to confer with him or her during working hours without loss of time or pay."* G.L.1956 § 28–7–13(3)(iii). (Emphases added.)

duties" under article 4.1; (4) the items that might constitute the employee "privileges and benefits" to be "maintained and continued" under article 35.5 of the CBA are not specified, but whatever these may be, they cannot alter or modify other provisions of the CBA unless they have been "executed in writing" as required by article 32.1 of the CBA; and (5) there is no reference in the CBA to any of the parties' actual past practices, no indication in the CBA that the parties' past practices should be treated as the unspecified privileges and benefits that are to be continued and maintained under article 35.5, and most significantly no agreement in the CBA to arbitrate disputes concerning the parties' past practices.

### A. The Nonarbitrable Nature of This Past–Practices Dispute

 We have previously stated that judicial authority to review the merits of an arbitration award is very limited. *See, e.g., State Department of Mental Health, Retardation, and Hospitals v. Rhode Island Council 94, A.F.S.C.M.E., AFL–CIO,* 692 A.2d 318, 322 (R.I.1997) (*MHRH*); *Town of Coventry v. Turco,* 574 A.2d 143, 146 (R.I.1990). The general rule is that "[a]bsent a manifest disregard of a contractual provision or a completely irrational result, the award will be upheld." *Turco,* 574 A.2d at 146. However, notwithstanding this circumscribed standard of review, an arbitration award will be vacated if, for example, the issue determined was not arbitrable in the first place, *see, e.g., Court Reporters,* 591 A.2d at 379, or if the arbitrator has otherwise exceeded his or her powers, G.L.1956 § 28–9–18(a)(2); *see also Turco,* 574 A.2d at 147–48 (concluding that arbitrator exceeded his authority because the award did not draw its essence from the contract and was not based on a passably plausible interpretation thereof); *State v. National Association of Government Employees Local No. 79,* 544 A.2d 117, 119–20 (R.I.1988) (affirming Superior Court decision that arbitrator manifestly disregarded contract provisions and therefore exceeded his powers).

 An arbitrator may exceed his or her powers in one of several ways. First, if the arbitration award does not "draw[ ] its essence" from the collective-bargaining contract or is not based upon a "passibly plausible" interpretation thereof, a court may determine that the arbitrator manifestly disregarded a contractual provision or reached an irrational result and thereby exceeded his or her authority. *See e.g., Turco,* 574 A.2d at 146 (quoting *Jacinto v. Egan,* 120 R.I. 907, 912, 391 A.2d 1173, 1176 (1978)). Second, an arbitrator may exceed his or her powers by interpreting a CBA in such a way that it contravenes state law or other public policies that are not subject to alteration by arbitration. *See MHRH,* 692 A.2d at 322 (vacating arbitration award when arbitrator exceeded his powers because the dispute was nonarbitrable and the submission of the dispute to arbitration constituted an unlawful usurpation of statutory authority); *Vose v. Rhode Island Brotherhood of Correctional Officers,* 587 A.2d 913, 914 (R.I.1991) (holding dispute nonarbitrable and subject instead to judicial determination because CBA provision conflicted with statutorily defined powers of one party to the CBA). In these instances we do not apply the more deferential standard accorded to an arbitrator's interpretation of a CBA on its merits; instead, we decide the question of arbitrability de novo. *MHRH,* 692 A.2d at 323. Our heightened level of review in such cases is predicated on the possibility that an arbitrator might be called upon to consider and to interpret a CBA in such a way that it would alter existing statutory policies or override other supervening state law governing the public-employment sector. *Id.* Third, an arbitrator is powerless to arbitrate that which is not arbitrable in the first place. *See id.* at 321.

In this case we first address the arbitrability of this dispute. As in the *MHRH* case "our disagreement is not with the arbitrator's interpretation of the CBA (in regard to which we express no opinion) but with the underlying premise that gave rise to that interpretation"—the arbitrability of a dispute concerning whether the DOC director may, by allegedly agreeing to or acquiescing in various past practices with respect to paid union leave, thereby preclude the Governor, the state's chief executive officer and high-

est-ranking CBA signatory, from taking steps to change or to withhold approval for such practices. *See MHRH,* 692 A.2d at 322.

■ Although no party has directly raised this issue on appeal, we consider "the right to have the grievance heard in arbitration at all, [to be] the equivalent of subject matter jurisdiction in the courts." *Id.* at 323 (quoting Nathan & Green, *Challenges to Arbitrability,* in 1 Labor and Employment Arbitration § 13.01[4], at 13–12). Therefore, we are not barred from reaching this issue sua sponte, nor would any party have been precluded from raising it at any time. In *MHRH* and *Vose* we concluded that the arbitration awards were invalid because they resulted from a determination of nonarbitrable issues in that they involved subjects already allocated by state law to the governmental employer. *MHRH,* 692 A.2d at 324; *Vose,* 587 A.2d at 915. In *MHRH* we noted that the Legislature had exclusively empowered the MHRH's director to provide for the health and welfare of the MHRH's patients. *MHRH,* 692 A.2d at 324. We therefore concluded that MHRH could not bargain away the director's statutory responsibilities by agreeing in a CBA to arbitrate a dispute concerning how many consecutive overtime hours its health-care employees could volunteer to work with disabled patients. *Id.* at 325. In *Vose* we similarly held that the DOC director could not arbitrate away his statutory powers concerning the safety, discipline, care, and custody of all persons committed to correctional facilities via a collective-bargaining provision regarding overtime hours. *Vose,* 587 A.2d at 915–16. Thus *MHRH* and *Vose* stand for the proposition that in a CBA, governmental employers may not bargain away authority that has already been delegated to management or to other governmental agents by state law or other paramount public policy.

In this case the CBA is silent with respect to what reasonable grounds might be relied upon by the DOC director to deny approval for paid union leave. Moreover, contrary to the arbitrator's decision, the CBA does not contain a so-called past-practices clause. Article 35.5 refers to maintaining and continuing all unspecified "privileges and benefits which employees have hereto enjoyed." However, the CBA does not define what constitutes such privileges and benefits; indeed, no mention whatsoever is made of any specific past practices, much less does the CBA equate past practices with the privileges and benefits referenced in article 35.5. Similarly there is no indication that the parties intended that paid full-time union leave would qualify as one of the protected privileges and benefits specified in article 35.5.

■ In the *Court Reporters* case we said that a contract "must contain a past-practice provision or a savings clause that evidences the mutual intent of the parties to establish these benefits [there, free employee parking] as enforceable past practices. *Otherwise these past practices cannot serve as the basis for arbitration.*" 591 A.2d at 378. (Emphasis added.) In our opinion the privileges-and-benefits language of article 35.5 does not evidence the parties' mutual intent to establish paid full-time union leave as a contractually protected benefit or privilege merely because of its status as a past practice. Indeed, the CBA makes no mention whatsoever of past practices serving as the basis for an arbitrable grievance. Here, as in the *Court Reporters* case, "we must limit our analysis to the four corners of the instrument." *Id.* Because past practices are not specified in the CBA as contractually protected "benefits and privileges," we hold, as we did in the *Court Reporters* case, that a grievance pertaining to alleged past practices is not arbitrable absent a specific CBA provision evidencing the mutual intent of the parties to bind themselves to such practices and identifying the specific past practices that are to be enforceable in this manner. Without such a provision DOC's past approval of requests for paid full-time union leave was a mere administrative policy that could be changed, like any other governmental policy, whenever the appropriate government authorities choose to do so. *Cf. Retired Adjunct Professors of Rhode Island v. Almond,* 690 A.2d 1342, 1346–47 (R.I.1997) (holding that retired teachers were not entitled to rely on the presumed permanency of postretirement reemployment statutes mere-

ly because the state's past practice was to offer such benefits).

Moreover, "[e]ven if we were to include past practices as grounds for arbitration under this agreement, we would not include this particular past practice. Evidence of mutual intent to adopt the course of conduct must be shown in order to sustain the practice." *Court Reporters*, 591 A.2d at 378–79. In the *Court Reporters* case we said that one of the five tests that must be satisfied before a particular course of conduct can qualify as a binding past practice is "acceptance of the practice by both parties." *Id.* at 379. Here there is no evidence that the existence of an unwritten past practice of DOC approving requests for paid full-time union leave has ever been accepted by the Governor, one of the key signatory parties to the CBA. Moreover, "[i]n a collective-bargaining agreement as explicit as the agreement in this case * * * it is only reasonable to expect that a matter as integral as [paid full-time union leave] would be provided for specifically if at all." *Id.* Accordingly, this past practice was not a matter suitable for arbitration under a CBA that says nothing about the effect of past practices, let alone about the particular past practice that is at issue here.

Indeed, because any past-practices provision embracing paid full-time union leave would constitute an alteration or a modification of article 15.1 of the CBA, it would have to have been in writing and signed by the parties to be binding. *See* art. 32.1 ("any alteration or modification of this Agreement shall be binding upon the parties hereto only if executed in writing"). If paid full-time union leave was a matter of right, either because it qualified as a binding past practice or as an enforceable employee benefit or privilege under article 35.5 of the CBA, such an entitlement would alter and modify the provisions of article 15.1 of the CBA, which allows the DOC director to disapprove union-leave requests if he or she has reasonable grounds to do so. Indeed, it would preclude DOC from withholding approval of employee

requests for paid full-time union leave no matter how reasonable DOC's grounds for doing so might otherwise be.[4] However, article 32.1 of the CBA mandates that any alteration or modification of the CBA must be "executed in writing" for it to be binding on the parties. Thus, even assuming that a past practice of paid full-time union leave might be eligible to qualify under article 35.5 as one of the "privileges and benefits which employees have hereto enjoyed," because such a practice would modify the terms of article 15.1, it could not possibly be binding on the parties unless it had first been "executed in writing." Here, however, it is undisputed that no such writing has been executed by the parties.

Thus, reading articles 32.1 and 35.5 of the CBA together, we determine that the only unwritten but agreed-upon privileges and benefits that can be maintained and continued are those that do not alter or modify any of the other terms of the CBA. Even the introductory exception clause to article 35.5 underscores this point: privileges and benefits will be maintained and continued "[e]xcept as otherwise expressly provided," that is, in one of the CBA's other provisions. With respect to paid union leave, article 15.1 expressly provides otherwise because it allows DOC to withhold approval of such leave requests if it has reasonable grounds to do so.

In sum, regardless of past practices, article 15.1 expressly allows DOC reasonably to withhold approval of paid-union-leave requests, including any requests for paid full-time union leave. Accordingly, with respect to DOC's ability reasonably to withhold approval of employee requests for paid full-time union leave, the CBA expressly provides for DOC to exercise its right to do so, and no unwritten employee privilege or benefit (let alone a mere past practice) can be interpreted by an arbitrator to alter or modify this contractual provision.

---

**4.** For example, during some prison crisis, DOC may well determine that it needs all its available employees to be present at work to address a particular situation. However, if the union's position were to carry the day, DOC would none-

theless be precluded from disapproving employee requests to take paid full-time union leave during such a crisis merely because DOC had a past practice of approving such requests.

Finally, even if this CBA had contained a binding past-practice clause and the prior actions of the state in allowing paid full-time union leave could satisfy all five criteria for qualifying as a binding past practice, "[w]hen the underlying circumstances supporting a binding practice change, there is good reason to conclude that the practice itself, being 'no broader than the circumstances from which it arises,' may also change." *Court Reporters,* 591 A.2d at 379 (quoting *National Broadcasting Co.,* 67 Lab. Arb. (BNA) 989, 992 (1976)).

Here the Governor issuing the challenged memorandum and guidelines has never agreed to the past practice of paying certain government employees to take full-time union leave. On the contrary, after taking office, he moved with seasonable dispatch to take steps to end this practice. In these circumstances the past practice can be no broader than the circumstances in which it arose: an unwritten agreement with one or more subordinate officials of one or more administrations that is subject to change when a new Governor is elected and takes steps within a reasonable time to carry out his or her reserved management prerogatives.

B. *The DOC Director's Lack of Authority to Enter into a Past-Practices Agreement without the Governor's Approval*

Although the DOC director is empowered to "[m]ake and enter into any contracts and agreements necessary or incidental to the performance of the duties and execution of the powers of the department," G.L.1956 § 42–56–10(s), neither the CBA nor other applicable law vests him with the actual authority to confer privileges and benefits upon union members for paid full-time union leave.

Indeed, because the CBA itself is signed by the Governor and because the Governor is the state's chief executive officer, any agreement to establish an employee privilege or benefit would first have to obtain the Governor's approval to be enforceable.[5] Here, the arbitrator found that any past practices allowing paid union leave had been verbally agreed to by the DOC director and thus were necessarily binding on the state. However, without the signed agreement of all CBA principals and signatories—including the Governor in his capacity as the "head of the executive department," G.L.1956 § 42-7-1—no such agreement would have been authorized or enforceable. Thus any unwritten agreement that the DOC director may have made with respect to such matters is invalid and unenforceable, and the union could not have justifiably relied upon this past practice as part of its privileges and benefits under the CBA. For these reasons we hold that the arbitrator exceeded his powers and authority in so ruling, and his award must be vacated for this reason alone.

Our recent decision in *Providence Teachers Union v. Providence School Board,* 689 A.2d 384 (R.I.1996), supports this result. There a panel of arbitrators decided that the school board had violated a parity clause in a CBA by failing to calculate teachers' salary increases correctly. *Id.* at 385. Without making a specific finding that the arbitrator exceeded his authority, we vacated the arbitration award because one party to the CBA lacked the authority to enter into a valid and binding contract with the union. *Id.* at 388. We determined that in light of certain enabling provisions the school board had not been vested with the final ratification authority for any agreement reached with the un-

---

**5.** We note that the Governor possesses the power to designate the DOC director as his negotiating representative vis-à-vis the union. *See* G.L.1956 § 36–11–1(b) (granting representatives of state employees the right to negotiate with the chief executive or his or her designee on matters related to wages, hours, and working conditions). However, nothing in the record or in the CBA shows that such a designation was made here. Moreover, even if the Governor had done so, such a designation would not obviate the need to obtain the Governor's written approval before the union could rely upon any negotiated agree-

ment with the DOC director as a contractually protected privilege and benefit. *Cf. Warwick Teachers' Union Local No. 915, AFT, AFL–CIO v. Warwick School Committee,* 624 A.2d 849, 852 n. 1 (R.I.1993) (holding that negotiating agents who lack actual authority must submit any tentative agreements to their principals for approval before they can be deemed binding: "in this state there has been a long tradition of presenting public-sector collective bargaining agreements to the principals for ratification after the negotiating representatives have reached a tentative agreement").

ion. Thus, we held that absent approval from the city council, the CBA was not binding on the parties. *Id.* at 386–87.

Moreover, we have on other occasions observed that the authority of a public agent must be actual in order to bind a governmental entity. *Warwick Teachers' Union Local No. 915, AFT, AFL–CIO v. Warwick School Committee,* 624 A.2d 849, 852 (R.I.1993); *School Committee of Providence v. Board of Regents for Education,* 429 A.2d 1297, 1302 (R.I.1981) (the *Providence School Committee* case). In the *Providence School Committee* case we granted a petition for certiorari from the Providence school board concerning a CBA dispute with the teachers' union. 429 A.2d at 1298–99. Under the terms of that CBA a per-diem substitute teacher who became long term during the school year would receive certain rights and privileges retroactively. *Id.* at 1299 n. 3. Because the school principal had "promoted" a per-diem substitute teacher to long-term status, the union claimed that the teacher was entitled to certain rights under the CBA. *Id.* at 1302. Reviewing the record for errors of law, we determined that the union was not entitled to rely upon the representations of the school principal. *Id.* We concluded that "any representations made by such an agent lacking actual authority are not binding on the municipality or its delegate the school committee." *Id.* We so held because there was no statutory delegation of authority allowing a principal to act independently from the school committee in promoting a per-diem substitute teacher to long-term status, nor did the school committee's manual vest such authority in a principal. *Id.*

In the *Warwick School Committee* case a public school committee and teachers' union entered into negotiations over a new collective-bargaining agreement. *Warwick School Committee,* 624 A.2d at 849. The union alleged an unfair labor practice when the committee refused to execute a contract that supposedly had been orally agreed to by both parties' negotiating representatives. *Id.* Nonetheless, we held that the school committee's negotiating representatives could not bind the school committee because to do so would contravene the specific instructions

limiting their bargaining authority. *Id.* at 851. Accordingly we held that no agreement had been reached between the parties and that the school committee had no obligation to execute a written CBA. *Id.* at 852. It is significant that we observed there that negotiating agents should submit any tentative agreements to their collective-bargaining principals for approval: "This is the only way that the members of the union on the one hand and the municipal authority (school committee or other municipal governing body) on the other may pass upon the recommendations of their negotiating agents. In teacher contracts the school committee, like the members of the union, must make the final determination regarding whether an agreement has been reached." *Id.* at 851 n. 1.

In the case at bar, we similarly conclude that the DOC director had no authority to modify the CBA by orally agreeing to past practices that were not expressly incorporated into the CBA or that were not otherwise ratified in writing by the Governor as the state's chief executive officer and principal signatory to the CBA. Rather the parties were required to obtain the approval of the Governor before any past or present DOC practices could be deemed to be contractually protected privileges and benefits under the CBA or before they could otherwise be relied upon to preclude the Governor from taking steps to define what reasonable grounds might exist to withhold state approval for paid-union-leave requests.

### III

### Conclusion

For the foregoing reasons, we sustain the state's appeal, reverse the judgment of the Superior Court, and vacate the arbitration award construing this CBA. In so doing, we have no occasion to reach the merits of the state's arguments with respect to the alleged illegality of DOC's past practice of paying state employees for full-time union leave. Hence we express no opinion on this issue because its resolution is unnecessary to the outcome of this case. The papers in the case shall be remanded to the Superior Court so

that a judgment consistent with this opinion can be entered in favor of the state.