DECISION
The State of Rhode Island, Department of Corrections (State), seeks to vacate an arbitration award which reinstated Officer Robert Giles (Giles). The Rhode Island Brotherhood of Correctional Officers (Brotherhood) moves to confirm the arbitration award, insofar as it finds that the termination of Correctional Officer Giles was not for just cause, and directs his reinstatement. Jurisdiction is pursuant to G.L. 1956 § 28-9-18.
 FACTS AND TRAVEL
On August 16, 2001, the State terminated the employment of Officer Robert Giles, a Correctional Officer (C.O.) with almost thirty years of experience. The State sent Giles a termination letter, outlining its reasons for dismissing him. The letter, in part, reads:
 "A pre-discipline meeting was held on March 23, 2001 to review information that you participated in the following misconduct: Conduct Unbecoming a Correctional Employer: To wit, on 1/24/01, at approximately 11:10 a.m., you harassed, taunted and physically threatened a fellow Correctional Officer at the Donald Price Facility. You further threatened said Correctional Officers with bodily harm. These actions are in violation of the Department's Code of Ethics and Conduct, Policy # 3.14.1, Section 3.a., 6.a., 2., 6.f.1., and 6. c.5.
 * * *
Your prior discipline record with the Department of Corrections reads as follows:
2/7/86 Absenteeism Oral (documented) 2/18/86 Breach of Security 15 Day Suspension (stipulated) 1/23/87 Disrespect/Insubordination 30 Day Suspension (stipulated) 9/5/91 Absenteeism Oral (documented) 9/26/91 Absenteeism Written Reprimand 1/24/94 Absenteeism Counseling 2/28/94 Absenteeism Oral (documented) 10/13/94 Conduct Unbecoming a C.O. 30 Day Suspension (stipulated) 4/5/95 Absenteeism Counseling 7/25/96 Absenteeism Oral (documented) 6/18/96 Dereliction of Duty Written Reprimand 10/22/96 Inattentive to Duty 2 Day Suspension (stipulated) 12/3/96 Dereliction of Duty 5 Day Suspension (stipulated) 4/19/98 Absenteeism Counseling 6/29/98 Conduct Unbecoming a C.O. Counseling 1/21/99 Disrespect/Insubordination 1 Day Suspension 6/1/99 Conduct Unbecoming a C.O. 15 Day Suspension (stipulated) 9/26/00 Absenteeism Counseling"
[See Arbitration Decision, at 3-4 for complete letter.]
Prior to the subject incident, on November 24, 1998, Giles and C.O. John Boutin (Boutin) had had a "scuffle with a broom handle" while they were both in the guard shack. Arbitration Decision at 5. Boutin claimed that Giles was the aggressor, and that during the altercation, Giles used the broom handle to choke him. Giles, however, was not formally disciplined for this incident. In a memorandum dated January 8, 1999, Deputy Warden Thomas Partridge found that Giles was guilty of excessive horseplay.
The memorandum, in part, reads:
 "I discussed these inappropriate actions with C.O. Giles and advised him to `play' off-duty. He was advised of this being a semi-military organization and the need . . . to conduct himself in a professional manner.
 . . . knowing CO Giles and his personal history, I introduced him to C.O. Mark Messier of the stress unit. He was told to seek guidance from this unit and to stay with them. If he continued with excessive horseplay, it could result in possible discipline or even termination." Arbitration Decision p. 5.
After the November 1998 incident in the guard shack, Boutin indicated that there had been other incidents between the two officers. Boutin, however, did not report any of those incidents citing the following reasons: (1) as a union steward who assists with employees accused of misconduct, he was reluctant to charge another employee with misconduct; (2) he did not want to develop a reputation for being involved in staff-on-staff conflict; and (3) since the Department had not formally disciplined Giles for the relatively serious November 1998 incident, he felt that it was unlikely that it would take any actions on less serious incidents. Arbitration Decision at 6. Boutin, however, believed that the January 24th incident was more serious than any of the interim incidents and brought it to the Department's attention.
The January 24th incident took place during the day shift while the correctional officers were preparing to take their lunch breaks. Starting at 11:00 a.m., the lunch breaks are taken in a sequential order, a process which should take one or two hours in total (30 to 60 minutes per C.O.). Boutin and C.O. Ciletti were assigned to the C-dormitory while Giles was assigned to the library. The standard practice was for Giles to relieve the C-dorm officers, Boutin and Ciletti. Giles had complained about Boutin taking extended lunch breaks in the past and causing him (Giles) to be late in returning to his assigned post. Boutin denies ever taking extended lunch breaks.
When Giles arrived in the C-dorm on January 24th, Ciletti had taken most of the C-dorm inmates down to the cafeteria to lunch. Consequently, Giles and Boutin were the only officers present in the C-dorm. Both agree that a verbal confrontation between the two ensued, but their accounts differ on what exactly occurred during the confrontation and who was to blame for it.
Giles indicated that he asked Boutin to take his lunch promptly and avoid any possibility of a late return. According to Giles, Boutin ignored him, even after Giles repeated his request. Giles then went to the bathroom where he dealt with some inmates who were smoking. When he returned to the C-dorm, Boutin was still sitting in the same position. Giles admitted that at this point, he became annoyed and may have raised his voice. He, however, claimed that it was Boutin who interjected profanities into the conversation by calling Giles "a piece of shit."Arbitration Decision at 7. Giles also denied mentioning the "guard shack incident" of November 1998 during the confrontation. Ultimately, the confrontation ended when Ciletti went to lunch first, followed by Boutin. Boutin returned by 12:30 p.m., allowing Giles to return to his assignment.
Boutin's account of the event differs in several significant respects. First, he claims that from the outset Giles stormed through the door yelling "go, go" in an out of control manner. Arbitration Decision at 9. Boutin then stated that he told Giles to calm down and called Ciletti to tell him to begin his lunch break. According to Boutin, after Giles returned from the bathroom, he continued yelling in an abusive manner, with spit coming from his mouth. Although Boutin indicated that he did not recall everything that Giles said, he did remember that Giles told him "remember that time in the guard shack; well, that was nothing."Arbitration Decision at 8. Boutin interpreted this as a threat. The incident, though, concluded without either man brandishing weapons or fists. Soon after the "guard shack" comment, Ciletti returned to the C-dorm before departing for his lunch break. After learning of the incident, the State terminated Giles's employment on August 1, 2001.
Giles grieved his termination, and the case was submitted for arbitration before Arbitrator Lawrence Katz in Case No. 11 E 390 02538-01. A hearing was held on October 1, 2001. The arbitrator rendered his decision, finding that the Department did not have just cause to terminate Giles and ordered his reinstatement on October 15, 2001.
 STANDARD OF REVIEW
Confirmation of an arbitration award is governed by § 10-3-11, which states:
 "at any time within one year after the award is made, any party to the arbitration may apply to the court for an order confirming the award, and thereupon the court must grant the order confirming the award unless the award is vacated, modified or corrected, as prescribed in §§ 10-3-12 — 10-3-14. Notice in writing of the application shall be served upon the adverse party or his or her attorney ten (10) days before the hearing on the application."
Vacating an arbitration award is governed by § 10-3-12, which provides:
 "In any of the following cases, the court must make an order vacating the award upon the application of any party to the arbitration:
 (1) Where the award was procured by corruption, fraud or undue means.
 (2) Where there was evident partiality or corruption on the part of the arbitrators, or either of them.
 (3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in hearing legally immaterial evidence, or refusing to hear evidence pertinent and material to the controversy, or of any other misbehavior by which the rights of any party have been substantially prejudiced.
 (4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."
This Court's "authority to review the merits of an arbitration award is very limited." Rhode Island Brotherhood of Correctional Officers v. StateDepartment of Correction, 707 A.2d 1229, 1234 (R.I. 1998) (citations omitted). This Court must determine "whether the arbitrator has resolved a grievance by considering the proper sources, such as the contract in effect between the two parties." Town of Coventry v. Turco, 574 A.2d 143, 146 (R.I. 1990) (quoting State v. National Association of GovernmentEmployees Local No. 79, 544 A.2d 117, 119 (R.I. 1988) (citing RhodeIsland Council 94 v. State, 456 A.2d 771, 773 (R.I. 1983)).
The general rule is that "[a]bsent a manifest disregard of a contractual provision or a completely irrational result, the award will be upheld." Rhode Island Brotherhood of Correctional Officers v. StateDepartment of Corrections, 707 A.2d at 1234 (quoting Town of Coventry v.Turco, 574 A.2d at 146). The court will uphold the arbitration award "so long as an arbitrator's award `draws its essence' from the contract and is based on a `passably plausible' interpretation of the contract . . . ." Town of Coventry v. Turco, 574 A.2d at 146 (quoting Jacinto v. Egan,120 R.I. 907, 912, 391 A.2d 1173, 1176 (1978)) (citations omitted). Furthermore, the court will vacate the arbitration award if the arbitrator "manifestly disregarded a contractual provision or reached an irrational result. . . ." Id. In reaching a decision, the court "may not reconsider the merits of an award despite allegations that it rests upon errors in fact or on a misrepresentation of the contract." Rhode IslandCouncil 94, AFSCME, AFL-CIO v. State, 714 A.2d 584, 588 (R.I. 1998) (citations omitted). The court's role "is to determine whether the arbitrator has rationally resolved the grievance by considering the contract between the parties and the circumstances out of which come the so-called common law of shop." Id. at 589 (citation omitted). Finally, " . . . the courts look with disfavor on efforts to overturn arbitration awards and thereby frustrate the arbitration process. Only in cases in which an award is so tainted by impropriety or irrationality that the integrity of the process is compromised should courts intervene."Prudential Property and Casualty Insurance Company v. Joyce M. Flynn,687 A.2d 440, 441 (R.I. 1996) (quoting Aetna Casualty Surety Co.v. Grabbert, 590 A.2d 88, 92 (R.I. 1991)). Because "public policy favors finality of arbitration awards . . . parties . . . are not allowed to circumvent an award by coming to the courts and arguing that the arbitrators misconstrued the contract or misapplied the law." Id. As long as the objecting party has ample opportunity to present evidence, then there is no abuse on the arbitrator's part. See Taylor et al. v. DeltaElectric Power, Inc., 741 A.2d 265, 267 (R.I. 1999).
 THE MODIFICATION OF THE AWARD
The State argues that the Arbitrator exceeded his authority in rendering an award which usurps the Director's statutory authority to "maintain security, safety and order at all state correctional facilities." G.L. 1956 § 42-56-10(2). In response, the Brotherhood argues that the Arbitrator went beyond the scope of his charge when he imposed the thirty-day suspension, but was within his authority when he determined that the termination was not for just cause.
The Arbitrator in the instant case derives his statutory authority from Rhode Island General Laws 1956 § 28 -9-1. Section 28-9-1 states in pertinent part:
 "A provision in a written contract between an employer and an association of employees, a labor union, trade union, or craft union, or between an association of employers and an association of employees, labor unions, trade unions, or craft unions to settle by arbitration any controversy is valid, irrevocable, and enforceable, except upon any grounds that exist in law or equity for the revocation of the contract; provided, that this chapter shall apply, but is not limited to, controversies respecting terms and conditions of employment."
The director derives his authority to impose discipline pursuant to Rhode Island General Law § 42-56-10. Specifically, § 42-56-10(2) provides in pertinent part, "In addition to exercising the powers and performing the duties which are otherwise given to him or her by law, the director of the department of corrections shall: . . . (2) Maintain security, safety, and order at all state correctional facilities . . . . " See 42-56-10(2). Furthermore, § 42-56-10(7) provides that the director shall, "Hire, promote, transfer, assign, and retain employees and suspend, demote, discharge, or take other necessary disciplinary action." See § 42-56-10(7).
The State of Rhode Island, Department of Corrections, and the Rhode Island Brotherhood of Correctional Officers have a written contract, dated 2000-2003, which provides for arbitration of dismissals, demotions or suspensions. See Arbitration Decision at 2. In accordance with its written contract, the dispute between the State and the Brotherhood was sent to arbitration on October 1, 2001.
With respect to said contract, § 28-9-1 addresses the issue of modification by providing:
 "Unless the parties agree otherwise in writing that the arbitrator has no authority to modify the penalty imposed by the employer in the arbitration of matters relating to the disciplining of employees, including, but not limited to, termination, suspension, or reprimand, the arbitrator has the authority to modify the penalty by the employer and/or otherwise fashion an appropriate remedy." (Emphasis added.)
Section 28-9-1, by its express language, allows for modification of penalties imposed by employers in matters relating to disciplining of employees unless the parties agree otherwise in writing. The record before this Court is silent as to a provision in the contract between the parties which would prohibit the modification of penalties relating to discipline. Accordingly, applying § 28-9-1 in isolation would allow for the modification of the Director's decision if so provided in writing.
 HARMONIZING R.I.G.L. § 42-56-10 § 28-9-1 WITH RESPECT TO MODIFICATION OF THE DECISION
However, the State further argues that the Arbitrator lacks the authority to modify the Director's decision because our Supreme Court has harmonized § 28-9-1 and R.I.G.L. § 42-56-10(2) and §42-56-10(7) to find that the disciplinary decisions of prison directors may not be usurped by arbitrators. Specifically, the State argues that § 28-9-1, when harmonized with § 42-56-10(2) and § 42-56-10(7), precludes an arbitrator from substituting his judgment for the judgment of a director of a correctional institution in matters relating to discipline. The Brotherhood argues that the Arbitrator had the authority to modify the Director's decision to terminate C.O. Giles, but exceeded his authority by upholding the suspension.
The Rhode Island Supreme Court has recently expressed concern when the conflict between a Collective Bargaining Agreement (CBA) and statutory authority limits an employer's ability to make decisions involving safety and security. In State of Rhode Island Departments of Corrections v.Rhode Island Brotherhood of Correctional Officers, 725 A.2d 296 (R.I. 1999), ("Riel"), the Supreme Court emphasized the director's non-delegable statutory duties under the law were not subject to modification, with respect to discipline functions, by the arbitrator:
 "We recognize that G.L 1956 § 28-29-1 empowers an arbitrator to modify a penalty imposed by an employer unless the parties agree in writing that the arbitrator shall have no such authority. This statute must be harmonized with those provisions set forth in § 42-56-10, which outlines the powers of the director of the Department of Corrections, in light of the director's nondelegable authority to maintain security, safety, and order at all state correctional facilities." Id.
Riel concerned a correctional officer who was arrested for driving under the influence of alcohol and sentenced to six months in a treatment center while she was employed at the Rhode Island Department of Corrections. The Department of Corrections terminated her for not reporting her arrest to the Department. The arbitrator in the Riel case modified the punishment of the Director and required her to be reinstated.
The Brotherhood argues that the holding in Riel is distinguishable on its facts, arguing that "conviction and incarceration are a far cry from a verbal altercation between two officers," at issue here. Brief forRhode Island Brotherhood of Correctional Officers at 5. The Court finds the Brotherhood's analysis unpersuasive. The Riel Court based its decision on the fact that the director had a nondelegable statutory duty to maintain the security and safety within the corrections facility. TheRiel Court held, "the authority of the director to direct employees in performance of their official duties may be compromised by requiring the director to reinstate Riel to the position of correctional officer."Riel, 725 A.2d at 298.
The Brotherhood further distinguishes the Riel case as not reconcilable with the DiDonato case. See Brotherhood of Correctional Officers v. Stateof Rhode Island, 643 A.2d 817 (R.I. 1994). In DiDonato, the Supreme Court upheld an arbitrator's decision to reinstate an employee who had been terminated. The case, however, dealt with a very specific question about notice to an employee who had had a prolonged absence from work — and not an employer performing an "essential aspect of its responsibilities." In contrast, the issues in Riel, as well as those of the case at bar, deal with an area of critical state power: maintaining security and safety within the corrections system. In Riel, our Supreme Court emphasized that the director of the Department of Corrections, unlike other agencies affected by § 28-29-1, is not in the position to delegate disciplinary functions to an arbitrator. Id.
Discipline of employees in a correctional facility is a highly specialized function of the director of the Department of Corrections. According to Riel, the director, alone, must decide disciplinary actions in correctional facilities. 725 A.2d at 298. In addition, our Supreme Court, in harmonizing § 42-56-10(2) and § 42-56-10(7) with §28-9-1, found that it was the intent of the Legislature to preserve the disciplinary functions of the director of the Department of Corrections over the broad powers given to arbitrators:
 "We believe that the Legislature did not intend the director under a CBA to abdicate the disciplinary function to an arbitrator in light of the awesome responsibility imposed upon the director." Id. See also Vose v. Rhode Island Brotherhood of Correctional Officers, 587 A.2d 913 (R.I. 1991); Lee v. Rhode Island Council 94, A.F.S.C.M.E., AFL-CIO, Local 186, 796 A.2d 1080, 1085 (R.I. 2002)
In the instant case the arbitrator concluded that Giles violated department policy by threatening another officer with violence: "I found CO Boutin's version of events to be far more logical and credible. . . . While it is fortunate that this incident did not escalate to the physical level, the credible evidence was sufficient to establish that the grievant threatened CO Boutin." Arbitration Decision at 9. Finally, the arbitrator concluded the decision by warning Giles against any further
violence or threats of violence: "By way of dictum, I offer the following thought to the grievant . . . . He has been placed on fair notice that any further acts of violence or threats of violence will not be tolerated and will be met with severe sanction, up to and including discharge."Arbitration Decision, at 16. The Arbitrator concluded that some punishment was warranted for Giles. The Arbitrator used his authority pursuant to § 28-9-1 and the parties' contract to find that the termination of C.O. Giles was not for just cause and ordered him reinstated with full seniority, benefits and back pay, less the pay for the period of the thirty-day suspension. Id. The Arbitrator, by his decision, modified the Director's decision from a termination to a suspension.
With respect to the modification of penalties, our Supreme Court has upheld the exception to the modification of penalties under a "narrow circumstances" provision. Lee v. Rhode Island Council 94, 796 A.2d 1080
(R.I. 2002). In Lee, our Supreme Court recognized that there are, "certain narrow circumstances involving critical aspects of the exercise of the state power in which a supervisor must be able to act in a manner free of constraints of the CBA." Id. at 1085. The Court limited "those situations to questions that interfere with the power of the employer to perform an essential aspect of its responsibilities." Id.
This Court finds that the circumstances in the instant case — the Director's terminating C.O. Giles to ensure the safety of the institution — fall under those "narrow circumstances" created by our Supreme Court. In order for the director of the Department of Corrections to properly perform and essential aspect of his responsibilities — maintaining a safe environment in the correctional facility — he has to be able to discipline correctional officers. Thus, the Arbitrator exceeded his authority in ordering the reinstatement of Giles. By reducing the termination to a suspension, the Arbitrator substituted his own judgment for that of the Director's, and by doing so, he exceeded his authority and disregarded the Director's statutory authority under §42-56-10(2) and § 42-56-10(7). See State DCYF v. RI Council 94,713 A.2d 1250, 1259 (R.I. 1998) (holding that the arbitrator exceeded his authority by substituting his own judgment on what constituted the proper job sanction); see also State of Rhode Department of Corrections 725 A.2d at 297; Rhode Island Laborers' District Council v. State, 592 A.2d 144
(R.I. 1991).
 DEPRIVATION OF DUE PROCESS
The Brotherhood argues that depriving the Arbitrator of the ability to modify the decision of the Director would have the effect of violating C.O. Gile's constitutionally protected due process rights, which are guaranteed under the 14th Amendment to the United States Constitution and Articles 1 § 2 of the Rhode Island Constitution. (See Brief for RhodeIsland Brotherhood of Correctional Officers at 5.) Specifically, the Brotherhood argues that C.O. Giles's procedural due process rights would be violated by denying him a review of the Director's decision. The State argues that it afforded C.O. Giles his procedural due process rights by giving him a pre-discipline meeting held on March 23, 2001 and the arbitration hearing held on October 1, 2001.
It is well settled that public employees have a protected property interest in their employment and are entitled to due process protections before they may be deprived of that interest. See Cleveland Board ofEducation v. Loudermill, 470 U.S. 532 (1985). The Rhode Island Supreme Court has addressed the due process rights of public employees in Kenyonv. Town of Westerly, 694 A.2d 1196 (R.I. 1997). In Kenyon, our Supreme Court upheld the discharge of an animal control officer because she had been afforded a pre-termination hearing which fulfilled due process requirements. Id. at 1201.
In the instant case, C.O. Giles was afforded a pre-discipline meeting before the Director terminated his employment and a post-termination hearing before the Arbitrator. C.O. Giles was represented by counsel at the arbitration hearing and was afforded the opportunity to present his case to the Arbitrator. The Brotherhood argues that C.O. Giles's procedural due process rights will be violated if the Arbitrator is precluded from modifying the decision of the Director, pursuant to our Supreme Court's holding in Riel.
The holding in Riel supports the proposition that the Arbitrator has the authority to vacate the Director's decision to terminate C.O. Giles by a finding that there was no just cause for C.O. Giles to be disciplined. However, under Riel, the Arbitrator who makes a finding of just cause is precluded from substituting his judgment for that of the director as to the form of the discipline. Accordingly, this Court finds that C.O. Giles's due process rights were afforded him during the arbitration hearing when he had the opportunity to present his case to the Arbitrator.
 CONCLUSION
This Court finds that the Arbitrator's decision exceeded his authority and usurped the statutory obligations of the Director under G.L. 1956 § 42-56-10(2). The Court also finds that the Arbitrator reached an irrational result by reinstating C.O. Giles, after concluding that Giles had indeed violated Department policy. Therefore, the State of Rhode Island's Petition to Vacate the Arbitrator's Award is granted, and the Rhode Island Brotherhood of Correctional Officer's Motion to Confirm the Award, insofar as it reinstated C.O. Giles, is denied. Counsel shall submit the appropriate order for entry.