DECISION[1]
[1] This Court wishes to express its appreciation for the extremely thorough and helpful briefs filed on behalf of the parties.
This Court has for decision an appeal of an arbitration award. The matter stems from a grievance procedure instituted by the Defendants against the Plaintiff, School Committee of the Town of North Kingstown (Committee). The grievance was initiated when Plaintiff assigned Defendant Sullivan, the president of the National Education Association of North Kingstown (Association), to participate in the "advisory period," a newly created ten (10) minute period designed to mentor all children in the North Kingstown High School where Sullivan is employed as an English teacher.
Before turning to the issues presented, this Court must observe that there is no more important role of state and local government than to educate its youth. No one disputes that the governmental role in education is deeply imbedded in both the evolution of this nation and in contemporary America. The best evidence of the current validity of this conclusion is the fact that more than two-thirds of most municipal budgets support public education. The legislature has similarly made this clear. See R.I.G.L. 1956 § 16-67-1.[2]
It is in the context of this governmental responsibility which neither of the parties dispute that this Court performs its review.
 ISSUES PRESENTED
I. IS THE ASSIGNMENT OF ROBERT SULLIVAN SUBJECT TO ARBITRATION?
Article IV, Section D of the relevant Collective Bargaining Agreement (CBA) between the parties provides in pertinent part: "The Committee and the Association agree during the dates this Contract is in effect, any and all disputes arising between them shall be settled in accordance with the grievance procedures of this Agreement."
The subject grievance, originally filed in September 2001, was ultimately decided by arbitration, the final stage of the grievance procedure established by the CBA. As it argued before the arbitrator, the Committee contends that the assignment of Sullivan to the "advisory period" is not an issue which is subject to arbitration. The Committee contends that such a conclusion is required because the implementation of the advisory period and the assignment of teachers to that task constitute a non-delegable duty mandated by state law. Accordingly, is not subject to the contract. This Court necessarily reviews de novo whether a dispute is subject to arbitration. See Rhode Island Bhd. ofCorrectional Officers v. State Dep't of Corrections, 707 A.2d 1229, 1234 (R.I. 1998).
There seems little purpose to be served by recounting the evolution of the pertinent statutes, regulations, and the Committee's response to same. In an attempt to remedy drop-out and literacy problems, our legislature passed the Rhode Island Literacy and Dropout Prevention Act, R.I.G.L. 1956 § 16-67-1, et seq., in 1987. As a result, the State Board of Regents promulgated draft regulations and then permanent regulations to implement the mandates of the Act. The draft regulations which were in effect at the time of the grievance, required all Rhode Island public schools to devise and implement a plan to ensure "more personalized learning environments for high school students that result in more students achieving the Regents' standards for academic proficiency." Regulations of the Board of Regents for Elementary and Secondary Education regarding Public High Schools and Ensuring Literacy for Students Entering High School, Draft 1.5 (hereinafter Draft Regulations), Paragraph 6.1 (Revised August 27, 2002). This section of the subject regulations is not significantly different than the final version of the regulations dated January 9, 2003. See Regulations of the Board of Regents for Elementary and Secondary Education regarding Public High Schools and Ensuring Literacy for Students Entering High School, Final Version 1.12 (hereinafter Final Regulations), Paragraph 6.1 (January 9, 2003).
The referenced statutory scheme mandates the creation of dropout prevention programs which are designed to "address the academic, social, or personal needs of potential dropouts." R.I.G.L. 1956 § 16-67-2(4). The Board of Regents is specifically empowered and required to "establish and promulgate regulations" for the purpose of carrying out the intent of the statutory scheme with respect to elementary and secondary education. R.I.G.L. 1956 § 16-67-6. In response to the draft regulations (which are now in final form), the Committee created the "advisory period," an approach specifically suggested by the draft regulations themselves. See Draft Regulations, Paragraph 6.1 — Requirement for personalized learning environments. Thus, with respect to all levels in the chain of responsibility for public high school education — legislative, Board of Regents, and local school committees — the establishment of an "advisory period" is clearly a statutory power and responsibility. It has likewise been an undisputed success.
There is no question that the Committee has broad statutory powers to operate and manage the schools within its jurisdiction. R.I.G.L. 1956 § 16-2-9(a)(3); Woonsocket Teachers' Guild, Local 951 v. WoonsocketSch. Comm., 770 A.2d 834, 838 (R.I. 2001). And quite clearly the "advisory period" falls within the scope of such powers and duties. The period or some alternative "personalized learning environment" is mandated.
The Plaintiff argues that the proper decision regarding the arbitrability of whether or not the president of the Association can be required to participate in the "advisory period" is governed by our Supreme Court's decisions in Pawtucket Sch. Comm. v. Pawtucket Teachers'Alliance, Local No. 930, 652 A.2d 970 (R.I. 1995) and WoonsocketTeachers' Guild, Local 951 v. Woonsocket Sch. Comm., 770 A.2d 834 (R.I. 2001).
In Pawtucket School Committee, the union filed a grievance regarding a policy that required all teachers in the Limited English Proficiency Program (English as a Second Language-ESL) to submit a weekly lesson plan. The associate director of the program explained in a memorandum to teachers that the procedure of submitting lesson plans was a management device to allow the supervisor to know what was being taught in those specialized classes. After the grievance was denied by the School Committee, the union sought arbitration. The School Committee sought a declaratory judgment and an order to enjoin arbitration, arguing that the lesson plan review was a management prerogative and, accordingly, not arbitrable. See Pawtucket Sch. Comm., 652 A.2d at 971. The Superior Court agreed.
On appeal our Supreme Court found that the requirements of the ESL program, which were mandated by both statute and Board of Regents' regulations, had been delegated to the school committees. And "while the school committee can negotiate many items with the professional and nonprofessional employees of the system, it can not bargain away statutory powers and responsibilities." Id. at 972. The Court then proceeded to determine that the evaluation of the ESL program — required by statute and regulation — was in itself a requirement of state law and could not be subject to arbitration. Accordingly, it affirmed the Superior Court's decision.
A more recent case of importance to this Court's analysis is WoonsocketTeachers' Guild, Local 951. That case involved the administration of medicine to a student who attended the Northern Rhode Island Collaborative (NRIC) program for special needs children. The student attended school in space leased from the Woonsocket School Committee. The school nurse employed at the facility objected to administering the medication to the child. The Guild, of which she was a member, filed a grievance on her behalf. The basis for the grievance was that although the student was attending school at the Woonsocket High School, she was not a student under the care and control of the school committee which was a party of the collective bargaining agreement under which the nurse performed her duties. The arbitrator who ultimately decided the grievance sided with the Guild, reasoning that it would set "bad precedent" if the nurse was ordered to serve students who were not within the exclusive control of the school committee. Woonsocket Teachers' Guild, Local 951,
770 A.2d at 836. Review was under taken by the Superior Court at the request of both parties. The Superior Court affirmed the decision of the arbitrator.
On appeal our Supreme Court noted that the trial court typically refrains from reviewing the merits of a previously arbitrated labor dispute. However, the Superior Court must vacate an award if that award was contrary to the governing statute, R.I.G.L 1956 § 28-9-18(a). As is presented here, the first issue before the court in WoonsocketTeachers' Guild, Local 951 was the issue of arbitrability. The Committee persisted in its position that because it had a non-delegable managerial duty to provide health services to NRIC students, the arbitrator was powerless to address the issue. The circumstance in Woonsocket Teachers'Guild, Local 951 that precluded arbitrability was a state law requiring the committee to provide health services to the NRIC student. As our Supreme Court stated, "[b]ecause this duty is created by state law, it is non-delegable and cannot be bargained away in the CBA." Id. at 838. Thus, in that state law must trump any CBA, "arbitration awards that act to modify the scope of the school committee's statutory duty are unenforceable because the arbitrator has no authority to make them." Id.
at 839.
This Court is confronted with a situation somewhat similar to those which arose in Pawtucket School Committee and Woonsocket Teachers'Guild, Local 951. All three of these cases deal with a school committee under a statutory and/or regulatory duty to perform an operational or managerial function. In Pawtucket School Committee, the duty was to evaluate that district's statutorily mandated ESL program. In WoonsocketTeachers' Guild, Local 951, the duty was to provide medical services. And here the duty is to formulate and execute an educational program designed to increase literacy and specifically reduce the dropout rate of high school students. Because the program created the so-called "advisory period" mandated by both statute and regulation, it is a duty and responsibility of the Committee which is not arbitrable.
However, here neither the Association nor the arbitrator has attempted to invalidate the "advisory period." The Association merely seeks to have its president exempted. This fact suggests that the holdings in PawtucketSchool Committee and Woonsocket Teachers' Guild, Local 951 are not controlling. By exempting the president of the Association, the Committee is in no measurable way prevented or hindered from carrying out its lawful duties and responsibilities. Accordingly, I find the subject grievance to be arbitrable.
The Court now turns to the issue of whether or not the arbitrator exceeded his powers in granting the award.
II. DID THE ARBITRATOR EXCEED HIS POWERS UNDER R.I.G.L. 1956 §28-9-18(a)?
As our Supreme Court has recently stated in Woonsocket TeachersGuild, Local 951:
 "The Superior Court typically refrains from reviewing the merits of a previously arbitrated labor dispute. However, a trial justice must vacate an award:
 (1) When the award was procured by fraud.
 (2) Where the arbitrator or arbitrators exceeded their powers, or so imperfectly executed them, that a mutual, final, and definite award upon the subject matter submitted was not made.
 (3) If there was no valid submission or contract, and the objection has been raised under the conditions set forth in § 28-9-13.
 An arbitrator exceeds his or her powers under § 28-9-18(a)(2) by resolving a non-arbitrable dispute or if the award fails to `draw its essence' from the agreement, if it was not based upon a `passibly plausible' interpretation thereof, if it manifestly disregarded a contractual provision, or if it reached an irrational result." Woonsocket Teachers' Guild, Local 951, 770 A.2d at 836-37 (internal citations and quotations omitted).
Here the arbitrator grounded his award on the Association's contention that Article VI (O) of the CBA precludes the assignment of Sullivan to the "advisory period" because it is a non-teaching duty. The rationale of the arbitrator was based on the logic that all teachers are specifically exempted from certain non-teaching duties as specified in Article VII, but the president of the Association is exempt from all non-teaching duties, pursuant to Article VI(O).
It appears to this Court that the arbitrator rushed imprudently to conclude that the teacher's role in the "advisory period" was a non-teaching duty. In his opinion and award, he stated:
 "The homeroom period — a duty to which teachers may be contractually assigned — is clearly a non-teaching duty. The substance of the advisory period places that activity in the same category." NEA North Kingstown v. North Kingstown Sch. Comm., AAA Case No. 11 390 00074 02 at 20 (January 27, 2003) (O'Brien, Arb.) (emphasis added).
This statement suggests that the arbitrator gave hardly more than lip service to the important purpose for which the "advisory period" was created. His conclusion appears to this Court to be fatally flawed in light of the statutory and regulatory purposes of the "advisory period."See R.I.G.L. 1956 § 16-67-1, et seq.; Draft Regulations; Final Regulations.
The advisory period is more than taking attendance. It is foremost designed to "address the academic . . . needs of potential dropouts." R.I.G.L. 1956 § 16-67-2(4). It in no way mirrors the obviously nonprofessional tasks of monitoring lunch, bus loading, playground and recess supervision, or "manning" ("womaning") the cash register which are the subject of Article VII. Those tasks can be accomplished by any responsible adult (or youth). The entire purpose behind the "advisory period" is mentoring, academic stimulation, promoting social and intellectual growth, and instilling a desire to academically achieve and graduate. These tasks, it seems to this Court, demand a teaching professional and constitute a teaching duty.
The Committee is required to "create more personalized learning environments for high school students that result in more students achieving the Regents' standards for academic proficiency. These plans include approaches such as `student advisories.'" Draft Regulations, Paragraph 6.1 (emphasis added). Thus, the "advisory period" is a personalized learning environment. It is properly expected that teachers will perform their art of teaching in such a personalized learning environment.
In sum, the "advisory period" requires the "personalized" teaching of both academic and life skills. It is not monitoring a bus, or a lunch period, or a playground. It requires a professional. It is not a non-teaching duty. Accordingly, with full recognition of the limited authority that this Court has to review the award of an arbitrator, R.I.G.L. 1956 § 28-9-18, this Court finds that the award here failed to "draw its essence" from the CBA, was not based upon a "passibly plausible interpretation" of the CBA, and constitutes an "irrational result." See Woonsocket Teachers' Guild, Local 951, 770 A.2d at 839. To adopt the arbitrator's award would be to totally disregard the statutory and regulatory purpose of the "advisory period."
The award In the Matter of the Arbitration Between NEA North Kingstownand North Kingstown School Committee, AAA Case No. 11 390 00074 02 datedJanuary 27, 2003 is hereby vacated. Counsel for the Plaintiff shall submit an appropriate judgment for entry.
[2] As one prominent expert on public policy recently observed: "[t]he bedrock of economic opportunity for all of Rhode Island's citizens is the public school . . .[I]t is hard to argue that there is a more important public service than to provide a high-quality, cost-effective public elementary and secondary-school system." Gary Sasse, Executive Director, R.I. Public Expenditures Council, "Confronting R.I.'s Surging Education Costs," The Providence Journal, May 18, 2003, at I10.