STATE of Rhode Island, DEPARTMENT
OF MENTAL HEALTH, RETARDA-
TION, AND HOSPITALS

v.

RHODE ISLAND COUNCIL 94,
A.F.S.C.M.E., AFL–CIO

RHODE ISLAND COUNCIL 94,
A.F.S.C.M.E., AFL–CIO

v.

STATE of Rhode Island, DEPARTMENT
OF MENTAL HEALTH, RETARDA-
TION, AND HOSPITALS.

No. 95–535–APPEAL.

Supreme Court of Rhode Island.

April 4, 1997.

Gerard P. Cobleigh, Warwick, for Plaintiff.

John Breguet, Cranston, for Defendant.

Before LEDERBERG, BOURCIER and FLANDERS, JJ.

**OPINION**

FLANDERS, Justice.

■ Can a department of state government bargain away its statutory responsibility to provide for the health and safety of its disabled, custodial patients by agreeing to arbitrate whether certain of its health-care employees (who are paid to look after these patients) can decide for themselves how many consecutive hours they will work when the state needs overtime help? In the circumstances of these consolidated cases, we answer this question in the negative and therefore reverse a Superior Court order confirming an arbitration award striking down a sixteen-consecutive-work-hours cap established by the state for these health-care employees.

The Rhode Island Department of Mental Health, Retardation, and Hospitals (variously the state or the department), appeals from two Superior Court orders that collectively confirmed an arbitrator's award rejecting the state's attempt to limit the consecutive hours that the department's public-health-care employees may work without taking time off from their jobs when the state needs overtime help. One order denied the state's motion to vacate the award in favor of Rhode Island Council 94, A.F.S.C.M.E., AFL–CIO (the union), and the other order granted the union's motion to confirm the award. The arbitrator found that the state violated the parties' collective-bargaining agreement (CBA) when it instituted a rule limiting public-health-care employees at the Institute of Mental Health (IMH) and the State's General Hospital (hospital)[1] to working no more than two consecutive eight-hour shifts.

Because we believe that the decision striking down the department's sixteen-consecutive-work-hours cap exceeded the arbitrator's powers, we reverse the Superior Court's orders and vacate the award. We hold that the department's power to establish a maximum-consecutive-work-hours cap for those health-care employees who work with its custodial patients was not properly arbitrable because it conflicts with the nondelegable managerial duties of the department and its director to provide for the safety and the welfare of these disabled, custodial patients and for the protection of the public's health.[2]

A panel of the Supreme Court heard this matter pursuant to an order directing both parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After reviewing the record, considering the legal memoranda submitted by the parties, and listening to their counsel at oral argument, we determine that cause has not been shown. Accordingly, we shall proceed to decide this appeal without further briefing or argument.

**Facts and Travel**

The union represents state employees in two separate bargaining units at the IMH and at the hospital. All employees work under constant supervision and provide direct care to patients who are elderly and/or physically or mentally disabled. Intermittently, when it is "necessary for the efficient conduct of the business of the [s]tate," the CBA provides that "an appointing authority [of the state] * * * direct[s] or authorize[s] overtime work."[3] The state offered overtime assignments to employees on a rotation-

1. Now named the Eleanor Slater Rehabilitation Hospital, G.L.1956 § 40.1–3–8.

2. "The state department of mental health, retardation, and hospitals is charged with the execution of the laws relating to the admission and custody of the mentally disabled." General Laws 1956 § 40.1–5–3. Moreover, "[i]n exercising the power and authority to provide for the care and physical welfare of the inmates, prisoners, patients, and pupils in the several institutions under its control and for the protection of the public health, the department of mental health, retardation, and hospitals * * * shall take all necessary steps to promote the health of the inmates, prisoners, patients, and pupils." General Laws 1956 § 40.1–2–16.

3. Overtime work is contractually defined as "the required performance of work in excess of the established work week."

al basis, but under the CBA it could only require these employees to work overtime if it could not muster sufficient volunteers. However, the CBA also provides that the department's health-care employees cannot be compelled to work more than sixteen consecutive hours, the equivalent of two consecutive shifts, except in a state emergency. Conversely, there was no express contractual limit on the number of consecutive hours for which these employees could volunteer to work when the department needed overtime help. Accordingly, on various occasions in the past, employees would volunteer to work three consecutive shifts, or twenty-four straight hours. Moreover, it was at least theoretically possible that an employee could work additional consecutive shifts.

In January 1992, concerned about the length of time its health-care employees could volunteer to work in one stretch without creating adverse health risks for the patients in its care, the department implemented a rule limiting these employees to two consecutive eight-hour shifts except in a state emergency. The union responded by filing grievances [4] protesting the state's new policy. These grievances were not settled, and the parties ultimately submitted the matter to arbitration.[5]

The union claimed that the department had a long-standing practice of allowing employees to work more than two consecutive shifts on a voluntary basis and that the CBA's past-practices clause [6] insulated this custom from the state's attempt to bypass the collective-bargaining process and thereby unilaterally change the status quo. The state claimed that the grievances were "not arbitrable" because two prior awards involving the parties, one issued in 1979 and the other in 1991, each of which was "final and binding" upon the parties, precluded litigation of these same issues under the principles of res judicata and collateral estoppel.[7] According to the state, those awards allowed the department to limit the amount of overtime an employee could work. The state further argued that even if the grievances over the consecutive-work-hours cap were arbitrable, they should be denied because such a directive was a valid exercise of a contractual managerial right [8] and was consistent

**4.** " '[G]rievance' means any difference or dispute between the [s]tate and the [u]nion * * * with respect to the interpretation, application, or violation of any of the provisions" of the CBA.

**5.** The CBA provides that "[i]f a grievance is not settled * * * such grievance shall, at the request of the [u]nion or the [s]tate, be referred to * * * arbitration." Furthermore, "[o]nly grievances arising out of the provisions of th[e] contract, relating to the application or interpretation thereof, may be submitted to arbitration."

The following stipulated issues were submitted to the arbitrator:
"Are the grievances arbitrable?
"If so, did the [s]tate violate the contract in January, 1992 when it limited the number of consecutive shifts which could be worked by employees at the Institute of Mental Health and the General Hospital? If so, what shall be the remedy?"

**6.** "Except as otherwise expressly provided * * *, all privileges and benefits which employees have hitherto enjoyed shall be maintained and continued by the [s]tate during the term of this agreement."

**7.** We note that this argument is more properly raised (at least initially) as a defense in the arbitration proceeding rather than as an issue for the court to consider concerning whether arbitration of this dispute is precluded *ab initio*. *See* Harvey A. Nathan & Sara McLaurin Green, *Challenges to Arbitrability, in 1 Labor and Employment Arbitration* § 13.04[6][a], at 13–59 n.57 (Tim Bornstein & Ann Gosline eds., 1996) ("It is debatable whether defenses of this kind render a grievance nonarbitrable or merely control the outcome on the merits. If the grievance is truly not arbitrable, the arbitrator would not hear any evidence on the merits. He or she would not be in a position to determine whether the prior action was sufficiently related to the present case to be controlling. Therefore, it seems more reasonable to conclude that defenses such as res judicata do not affect arbitrability, i.e., the right to be heard, but affect the arbitrator's judgment on the merits."); *see also* Jay E. Grenig, *Stare Decisis, Res Judicata, and Collateral Estoppel, in 1 Labor and Employment Arbitration* §§ 15.03, 15.04 (Tim Bornstein & Ann Gosline eds., 1996).

**8.** The CBA provides, in pertinent part, as follows:

"The [u]nion recognizes that except as specifically limited, abridged or relinquished by the terms and provisions of this agreement, all rights to manage, direct or supervise the operations of the [s]tate and the employees are vested solely in the [s]tate.
"For example, but not limited thereto, the employer shall have the exclusive rights sub-

with the state's obligation under the CBA to provide and maintain safe working conditions.[9] As for the union's past-practice argument, the state asserted that although employees were permitted to work in excess of two consecutive shifts prior to 1992, it did not thereby forfeit its inherent managerial right to limit such overtime in the future merely by not having chosen to exercise that authority in the past.

The arbitrator distinguished the two prior awards and found that the grievances were arbitrable. On the merits the arbitrator concluded that the past practice of allowing employees to work voluntarily more than two consecutive shifts was a protected privilege and an employee benefit that limited the state's inherent managerial rights. He therefore decided that the state violated the CBA when it instituted the rule limiting the number of consecutive shifts employees could work. Consequently he ordered that "[t]he limitation * * * be removed immediately."

Each party filed motions in separate proceedings in the Superior Court: the state requested an order vacating the award, and the union requested an order confirming the award. The Superior Court, after consolidating the proceedings, found that the award was rational and that it drew its essence from the CBA; therefore, it granted the union's motion to confirm and denied the state's motion to vacate.

The state now seeks reversal of the Superior Court's confirmation of the award on several grounds. According to the state, the award resulted from the arbitrator's determination of a "nonarbitrable" issue in that it conflicts with the statutory authority of the director of the department. The state also claims that the award does not derive its essence from the CBA and contravenes public policy. Finally, the state contends that the arbitrator usurped the state's contractually protected managerial right "to set reasonable limits as to how many hours one [employee] can work." The union argues that the Superior Court's orders must be affirmed under settled Rhode Island law limiting the scope of this court's review of the Superior Court's confirmation of an arbitrator's award.

## Analysis

General Laws 1956 § 28–9–13(1) provides that "[a] party who has participated in any of the proceedings before [an] arbitrator * * * may object to the confirmation of the award only on one or more of the grounds hereinafter specified." The specified ground that is applicable to this matter is provided at § 28–9–18(a)(2): a "court must make an order vacating the award * * * [w]here the arbitrator * * * exceeded [his or her] powers." *See Pawtucket School Committee v. Pawtucket Teachers' Alliance, Local No. 930, American Federation of Teachers,* 652 A.2d 970, 972 (R.I.1995) (affirming Superior Court's enjoining of arbitration award because "requirements of state law * * * cannot be submitted to arbitration"); *Rhode Island Laborers' District Council v. State,* 592 A.2d 144, 146 (R.I.1991) (in affirming Superior Court's vacating of arbitrator's award, court noted that an "arbitrator may not substitute his or her judgment for that of appointing authority" who had been statutorily given power and duty to supervise operations of District Court); *see also Jacinto v. Egan,* 120 R.I. 907, 923, 391 A.2d 1173, 1181 (1978) (Weisberger, J., dissenting) ("the appropriate rule to follow in respect to enforcement or review of an arbitrator's decision might be derived from a literal reading" of the " 'exceeded their powers' " language of what is now § 28–9–18(a)(2)).

We are of the opinion not only that the arbitrator exceeded his powers in this case because the dispute at issue was nonarbitrable but also that the submission of such a

---

ject to the provisions of this agreement and consistent with the applicable laws and regulations:

A. To direct employees in the performance of the duties of positions;
* * *
C. To maintain the efficiency of the operations entrusted to it;

D. To determine the methods, means and personnel by which such operations are to be conducted * * *."

9. The CBA's language on this issue is as follows: "The [s]tate shall make every reasonable effort to provide and maintain safe working conditions relating to the safety and health of employees."

dispute to arbitration constituted a usurpation of the exclusive statutory authority of the department and its director "to insure the comfort and promote the welfare of the patients." Section 40.1–5–3(7).[10]  *Cf. Pawtucket School Committee*, 652 A.2d at 972 ("[w]e have stated clearly that while the school committee can negotiate many items with the professional and nonprofessional employees of the system, it cannot bargain away statutory powers and responsibilities[;] * * * requirements of state law * * * cannot be submitted to arbitration"); *Rhode Island Laborers' District Council*, 592 A.2d at 146 ("there are limits to the extent that a statutory power and responsibility may be bargained away in a labor contract"); *see also Belanger v. Matteson*, 115 R.I. 332, 359, 346 A.2d 124, 140 (1975) (Paolino, J., concurring in part and dissenting in part) (discussing School Teachers' Arbitration Act; stating further that "some disputes, being formally designated as matters of management * * * do not properly fall within the ambit" of arbitrability).

■ Preliminarily we acknowledge that our review of the merits of an arbitration award is extremely limited.[11]  Our job is to determine whether the Superior Court erred as a matter of law in upholding the challenged award. *State v. Rhode Island State Police Lodge No. 25*, 544 A.2d 133, 136 (R.I. 1988); *Belanger*, 115 R.I. at 356, 346 A.2d at 138 ("[e]xcept for complete irrationality, arbitrators are free to * * * determine the facts of a dispute before them without their award

being subject to judicial revision");[12]  *see generally Prudential Property and Casualty Insurance Co. v. Flynn*, 687 A.2d 440, 440 (R.I.1996) ("reaffirm[ing] our long-standing practice of upholding arbitration awards absent extraordinary circumstances").  However, this is not an instance of "[j]udicial reversal of an arbitration award based solely upon a disagreement with the arbitrator's interpretation of the contract * * *."  *Jacinto*, 120 R.I. at 916, 391 A.2d at 1178.  On the contrary, our disagreement is not with the arbitrator's interpretation of the CBA (in regard to which we express no opinion) but with the underlying premise that gave rise to that interpretation: the arbitrability of a dispute concerning whether the state's health-care employees may unilaterally decide to work as many consecutive hours as they want to work when the state needs overtime help to care for its disabled, custodial patients.  Whereas we acknowledge that an arbitrator is "necessarily * * * called upon to make rulings concerning the applicable law and to interpret the law according to the facts," *Vose v. Rhode Island Brotherhood of Correctional Officers*, 587 A.2d 913, 914 (R.I. 1991), and that questions of law are not "per se" nonarbitrable, *id.*, that acknowledgment does not insulate the arbitrator's interpretation of the law from judicial scrutiny.  *See* § 28–9–18(a)(2) (court must vacate an award where "arbitrators exceeded their powers").  Indeed, we implied as much in *Vose* when we refuted the suggestion that questions of law are per se nonarbitrable.  Like a judge sit-

---

**10.** Because of our decision to dispose of the state's appeal on this basis, we do not reach or decide any of the state's other arguments concerning why the confirmation of the award should be reversed.

**11.** "A reviewing court must determine whether the arbitrator has resolved a grievance by considering the proper sources, such as the contract in effect between the parties." *State v. National Association of Government Employees Local No. 79*, 544 A.2d 117, 119 (R.I.1988). " 'Absent a manifest disregard of a contractual provision or a completely irrational result,' " the courts have no authority to vacate the arbitrator's award. *Rhode Island Brotherhood of Correctional Officers v. State*, 643 A.2d 817, 820 (R.I.1994). As long as the award " 'draws its essence' from the contract and is based upon a 'passably plausible' interpretation of the contract, it is within the

arbitrator's authority and our review must end." *Id.* (citing *Town of Coventry v. Turco*, 574 A.2d 143, 146 (R.I.1990) (Kelleher, J., dissenting) (quoting *Jacinto v. Egan*, 120 R.I. 907, 912, 391 A.2d 1173, 1176 (1978))). "The statutory authority to vacate an arbitration award where the arbitrators 'exceeded their powers' does not authorize a judicial re-examination of the relevant contractual provisions." *Jacinto*, 120 R.I. at 912, 391 A.2d at 1175.

**12.** Indeed, "arbitrators 'are under no obligation to set out the reasons for their award or the findings of fact or conclusions of law on which that award is premised.' " *Warner v. Aetna Casualty and Surety Co.*, 624 A.2d 304, 305 (R.I.1993); *Jacinto*, 120 R.I. at 923, 391 A.2d at 1181 (Weisberger, J., dissenting) ("arbitrators have no obligation even to provide reasons for their determinations").

ting without a jury, an arbitrator necessarily interprets the law and facts, and his or her decision is similarly subject to further judicial review.

■ Furthermore, contrary to our highly circumscribed review of the merits of an award,

"the issue of whether a dispute is arbitrable concerns a question of law and is subject to a broader standard of review than is the arbitrator's decision on the merits. * * * Courts should not equate the issue of arbitrability with the deference due the arbitrator's interpretation of the contract. * * * Rather, a reviewing court must decide the question of arbitrability de novo." *Providence Teachers' Union Local 958— American Federation of Teachers v. Providence School Committee*, 433 A.2d 202, 205 (R.I.1981).

*See also Rhode Island Brotherhood of Correctional Officers v. State*, 643 A.2d 817, 820 (R.I.1994) (" 'because arbitration is a creature of the agreement, the preliminary issue for a reviewing court must be whether the parties derive from the contract an arbitrable grievance' "); *Town of Coventry v. Turco*, 574 A.2d 143, 147 (R.I.1990) ("[a]lthough public policy favors the final resolution of disputes * * * by arbitration, this policy relies on the premise that arbitrators act within their power and authority").

■ First, we observe that the trial justice erroneously relied upon *Coventry Teachers' Alliance v. Coventry School Committee*, 417 A.2d 886 (R.I.1980), to find that the state was "barred from raising any question of substantive arbitrability once it has participated in the arbitration." *See id.* at 889 ("[a] party who has participated in arbitration proceedings cannot later seek to vacate the award on the ground that the controversy was not arbitrable"). Later decisions make clear that *Coventry Teachers' Alliance* was "never intended [to bar] * * * judicial review when a party has preserved its objection at the arbitration hearing." *Providence Teachers' Union*, 433 A.2d at 204; *see also State v. Local No. 2883, American Federation of State, County and Municipal Employees*, 463 A.2d 186, 189 (R.I.1983) ("[i]t is well settled in this jurisdiction that if a party objects to substan-

tive arbitrability at the arbitration hearing and then proceeds to arbitration, the party has preserved the issue for later determination by a reviewing court"). Because the state objected to arbitrability at the hearing, it preserved the issue for review by the courts. In any event, because the issue to be arbitrated implicated the state's nondelegable duties to "take all necessary steps to promote the health" of its custodial mental patients, § 40.1–2–16, and other disabled persons in its custody and to "provide for [their] proper care," § 40.1–5.3–1, this matter would still be properly before us even if the state had failed to object to arbitrability. This is so because we deem "the question of substantive arbitrability, the right to have the grievance heard in arbitration at all, [to be] the equivalent of subject matter jurisdiction in the courts." Nathan & Green, *Challenges to Arbitrability, in 1 Labor and Employment Arbitration* § 13.01[4], at 13–12.

Second, the fact that the state submitted an issue to arbitration does not operate to lessen the scrutiny with which we review the question of arbitrability, especially when the question is not merely of contractual interpretation (that is, whether and to what extent the parties did agree to arbitrate) but of statutory authority (that is, whether and to what extent the parties could agree to arbitrate away a power that is statutorily given to the department and its director). More specific to this case, the critical question is: when does the determination of an otherwise arbitrable issue impermissibly infringe upon the statutory authority of the department and its director? *See Belanger*, 115 R.I. at 361–62, 346 A.2d at 141 (Paolino, J., concurring in part and dissenting in part) ("It is incumbent upon the courts * * * to render an interpretation of * * * [the terms 'conditions of employment' and 'policy'] whenever a matter is presented which does not clearly belong in one class or the other. * * * The ultimate outcome of such a categorization * * * is a determination as to whether the matter in issue is arbitrable."). *But see Barrington School Committee v. Rhode Island State Labor Relations Board*, 120 R.I. 470, 479–80, 388 A.2d 1369, 1375 (1978) (holding that, in the context of interest arbitration,

"when * * * the problem involved concerns both a question of management and a term or condition of employment, it is the duty of the committee to negotiate with the teachers involved").

Although the state is statutorily mandated to negotiate concerning hours and other conditions of employment, G.L.1956 §§ 36–11–1(a) and 36–11–7, and indeed was contractually bound to arbitrate grievances regarding such issues with the union, the extent to which the state is obligated to arbitrate regarding its health-care employees' hours of work is not boundless. Rather it is circumscribed by the statutory obligations of the department and of the director to protect the disabled, custodial patients who are entrusted to their care (and indirectly by their obligations to provide for the protection of the public health). Thus, neither the department nor its director is empowered to delegate to arbitrators the department's statutory obligation to take all steps necessary to provide for the health and welfare of these patients. *Pawtucket School Committee,* 652 A.2d at 972 ("requirements of state law * * * cannot be submitted to arbitration"); *see also Belanger,* 115 R.I. at 365, 346 A.2d at 142 (Paolino, J., concurring in part and dissenting in part) ("the school committee, by permitting the submission of this matter to arbitration, unlawfully delegated the discretionary authority that has been entrusted to it by statute").

The statutory authority against which this award must be measured reveals that the department and its director are charged with the responsibility of ensuring the well-being of the department's disabled, custodial patients, many of whom are helpless to care for themselves. The department "is charged with the execution of the laws relating to the admission and custody of the mentally disabled." Section 40.1–5–3. "In exercising the power and authority to provide for the care and physical welfare of the inmates, prisoners, patients, and pupils in the several institutions under its control and for the protection of the public health, the department

* * * shall take all necessary steps to promote the health of the inmates, prisoners, patients, and pupils * * *." Section 40.1–2–16. Further, the director "shall maintain * * * an appropriate facility for the confinement of persons committed to his or her custody * * * and shall provide for the proper care, treatment, and restraint of all such persons," § 40.1–5.3–1, and "may adopt such rules and regulations governing the management of facilities, both public and private, as he or she may deem necessary to carry out the provisions of this chapter to insure the comfort and promote the welfare of the patients," § 40.1–5–3(7). Manifestly, the sixteen-consecutive-work-hours cap was adopted and implemented by the department pursuant to these statutory enabling provisions.

In weighing the arbitrability of the dispute that led to this award against the department's statutory authority, we believe that a decision that requires the state to allow its health-care employees to insist on their being allowed to provide health care for retarded and disabled mental patients in the state's custody for over sixteen consecutive work hours encroaches upon the department's and the director's statutory duties to "provide for the proper care * * * of all such [patients]" and to "adopt such rules and regulations governing the management of facilities * * * to insure the comfort and promote the welfare of the patients." *See Rhode Island Brotherhood of Correctional Officers,* 643 A.2d at 821 (recognizing that "there may be some limitations on a CBA to supersede state statutes in certain critical areas such as the obligation of the director of corrections to require overtime services under emergent conditions, *Vose, supra,* or a chief judge to exercise control over a disobedient subordinate, *Rhode Island Laborers' District Council v. State,* 592 A.2d 144 (R.I.1991)"). Such an award bestows upon the IMH's and the hospital's employees the unilateral right to decide for themselves whether they are competent to care for the state's mental patients for extended periods far in excess of the normal workday.[13] Given their statutory

---

**13.** *A review of the CBA shows that there are four scheduled shifts: 7 a.m. to 3 p.m., 8 a.m. to 4:30 p.m., 3 p.m. to 12 a.m., and 11 p.m. to 8 a.m.*

*Thus there is the distinct possibility that a nurse who has completed a volunteered third consecutive shift would then be obliged to work his or*

responsibilities to "take all necessary steps to promote the health of the * * * patients" and to "adopt such rules and regulations * * * to insure the comfort and promote the welfare of the patients," the department and its director should not have to arbitrate before they can perform their statutory duty to manage these patients' health care by limiting the consecutive work hours of the department's health-care employees. Nor should the department have to put patients at risk by being forced to allow its disabled patients to be cared for by employees who insist on voluntarily working three consecutive shifts in nonemergency situations.

Although the state can point to no particular occasion when an employee who worked a third consecutive shift was involved in a health-care mishap, we do not believe that the state should be obliged to wait for a patient-care calamity to occur before it is allowed to manage proactively. Even though the state admittedly retained its contractual right in the face of this award to "relieve employees from duties because of * * * legitimate reasons," its supervening statutory authority to take all necessary steps to promote these patients' health should not be relegated to the status of a post-hoc damage-control option. In other words, when it comes to its statutory duty of looking after these disabled patients, the state should not have been required to arbitrate whether it should take nine stitches in time to save it from taking one.

Finally, we reject the union's past-practices argument. *See generally Rhode Island Court Reporters Alliance v. State of Rhode Island,* 591 A.2d 376, 378–79 (R.I.1991) (discussing requisites to finding a past practice). Just as "there are limits to the extent that a statutory power and responsibility may be bargained away in a labor contract," *Rhode Island Laborers' District Council,* 592 A.2d at 146, so too are there limits to the extent to which a past practice can erode the statutory managerial rights of the department and its director. Although the state may have allowed (and perhaps even benefited from) this past practice of letting its health-care employees volunteer for as many consecutive overtime hours as they wished to accumulate, its statutory right and obligation to take steps that will promote the welfare and the comfort of its patients and to provide for the protection of the public's health cannot be sacrificed on the altar of its earlier inaction—especially when it had no statutory duty to act in the past on pain of waiving its right to act in the future with respect to this issue. *Salus populi est suprema lex* (Regard for the public welfare is the highest law).

### Conclusion

The state's appeal is sustained, the orders of the Superior Court are reversed, and the arbitrator's award is vacated. The papers of this case are remanded to the Superior Court with instructions to enter judgment for the state in accordance with this opinion.

WEISBERGER C.J., did not participate.

her next regularly scheduled shift on the next day. Conceivably then, a nurse could go into work on Monday at 7 a.m. to work the scheduled shift, work two additional consecutive shifts on overtime, and then be obligated to work another scheduled shift at 7 a.m. on Tuesday, going home at 3 p.m., having already worked thirty-two hours for the week.