[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
The arbitration decision at issue between the Rhode Island Probation and Parole Association ("Union") and the State of Rhode Island ("State"), acting on behalf of the Department of Corrections ("DOC") and the Department of Children, Youth and Families ("DCYF"), involves a grievance dispute over whether the terms of their Collective Bargaining Agreement ("CBA") permit the directors of the DOC and the DCYF to contract with temporary employees to do clerical work also performed by bargaining unit employees is arbitrable. The arbitrator found that the language of the CBA allowed the issue to go before an arbitrator and that the State did not violate the CBA by hiring temporary employees to perform clerical duties in either agency. What is unusual is that the losing party in arbitration moves this Court to confirm the arbitration award, while the State asks the Court to vacate the same award. The issue brought before this Court is whether there was subject matter jurisdiction for this issue to go before an arbitrator.
 FACTS
In October 1999, the Union filed a grievance pursuant to the CBA that eventually went to arbitration. The grievance alleged that the DCYF, the DOC, and their respective directors violated the CBA by hiring temporary employees to complete necessary clerical work in lieu of bargaining unit employees. The agencies claimed that the temporary contracting was necessary because the legislature-granted budget did not allow for the hiring of an adequate number of bargaining unit employees. Such temporary employees were used when permanent positions became vacant and the agencies were not authorized to fill those positions. The temporary employees performed the same clerical duties as bargaining unit employees. There is no evidence that shows funds were transferred from permanent clerical positions to contract for temporary employees or permanent positions were kept vacant to fill them with temporary employees. The arbitrator found that by the terms of the CBA an arbitrable grievance existed, and the arbitrator made a ruling in favor of the State.
 STANDARD OF REVIEW
The General Assembly codified the standard that a trial judge must vacate an award "where the arbitrator or arbitrators exceeded their powers, or so imperfectly executed them, that a mutual, final, and definite award upon the subject matter submitted was not made." G.L. 1956 § 28-9-19(a)(2). Arbitrators' decisions are given deferential review by Rhode Island courts which have limited reviewing power to vacate such an award. Townof North Providence v. Local 2332 Int'l Ass'n of Fire Fighters,AFL-CIO, 763 A.2d 604 (R.I. 2000); R.I. Bhd. of Corr. Officersv. State of R.I. Dept. of Corr., 707 A.2d 1229 (R.I. 1998);Town of Coventry v. Turco, 574 A.2d 143 (R.I. 19990); Jacintov. Egan, 391 A.2d 1173 (R.I. 1978). An arbitrator's decision is reasonable when "the award `draws its essence' from the contract, and is based upon a `passably plausible' interpretation of the contract, it is within the arbitrator's authority and [the court's] review must end." Jacinto, 391 A.2d at 1176 (citingUnited Steelworkers of Am. v. Enter. Wheel Car Corp.,363 U.S. 593, 597 (1960)). The burden of proving an arbitrator exceeded his authority falls on the challenging party and "every reasonable presumption in favor of the award will be made [by the court]. Coventry Teachers' Alliance v. Coventry Sch. Comm.,417 A.2d 886, 888 (R.I. 1980).
 WHETHER THE ARBITRATOR EXCEEDED HIS POWER IN ARBITRATING THE EMPLOYMENT DISPUTE PURSUANT TO THE CBA
The first argument presented by the State is that the arbitration award should be vacated because the arbitrator so "exceeded [his] powers, or so imperfectly executed them, that a mutual, final, and definite award upon the subject matter submitted was not made." Section 28-9-19(a)(2). The State alleges that the arbitrator's exercise of jurisdiction over the subject matter in dispute was in excess of his power because this grievance involved discretionary agency management decisions which are not the proper subject matter for collective bargaining arbitration. Meanwhile, the Union contends that the arbitrator's interpretation of the CBA's language determining that there was the appropriate jurisdiction to hold an arbitration hearing was proper and reasonable. See City of Woonsocket v. Int'l Bhd. ofPolice Officers, 839 A.2d 516, 518 (R.I. 2003) (the court confirmed an arbitrator's method of looking at disputed contract's terms which resulted in a plausible interpretation of the relevant terms); Town of North Providence, 763 A.2d at 606 (the court held the arbitrator's award was "passably plausible" because it was consistent with the terms of the agreement).
The language in Article 26.1 of the CBA defines a grievance as "any difference or dispute between the State and the Union, or between the State and any employee with respect to the interpretation, application, or violation of any of the provisions of the Agreement." In a situation where the grievance procedure of Article 26.2 of the CBA cannot resolve the dispute, the issue can be submitted to binding arbitration under Article 27.1 of the CBA.[1] Here, the issue revolves around each party's separate interpretation of whether Article 31.1 permits the State to contract with temporary help outside the bargaining unit. Thus, on the face of the agreement, it would appear that because a genuine dispute exists between the parties over the interpretation of certain provisions within the CBA, it was reasonable for the arbitrator to determine that an arbitrable issue existed.
The State nonetheless argues that the arbitrator's decision finding subject matter jurisdiction over this grievance interferes with the General Assembly's grant of statutory management authority to the agency directors. First, the State claims the exercise of subject matter jurisdiction by the arbitrator is an unlawful usurpation of or interference with the exclusive authority vested in the directors of the DCYF and the DOC to manage their respective departments pursuant to G.L. 1956 §§ 42-56-10, 42-72-4. The State alleges that an arbitration ruling infringes on the statutory authority of the DCYF and the DOC directors to effectively and efficiently direct the operation of their departments and to determine the means by which programs, services, and plans for each agency's respective charges are provided. See Sections 42-56-10, 42-72-4. This includes the authority of the directors to contract with private service providers necessary or incidental to the performance of the duties of the respective state agencies. Sections42-56-10(19), 42-72-5(b)(5). In addition, the State points out that the director of DCYF is under a statutory obligation "[t]o establish those administrative and operational divisions of the department that the director determines is in the best interests of fulfilling the purposes and duties" of the agency. Section42-72-5(b)(1). Also, within Article IV of the CBA, the State claims is a mutually agreed upon provision that the directors' retained management of the workplace and that Article XXXI of the CBA specifically confers authority upon the directors to subcontract bargaining unit work.[2]
To support their argument, the State refers to a number of decisions where the Rhode Island Supreme Court held an agencies' statutory obligations limit the arbitrability of grievances.See Woonsocket Teachers' Guild, Local 951, AFT v. WoonsocketSch. Comm., 770 A.2d 834, 837 (R.I. 2001) (the court held a grievance alleging a school principal lacked authority to order a school nurse to dispense medication to special needs students was not arbitrable because school health services were a statutory obligation); State of R.I. Dep't of Children, Youth Familiesv. R.I. Council 94, Am. Fed'n of State, County, and Mun.Employees, AFL-CIO, 713 A.2d 1250 (R.I. 1998) (the court held an arbitrator had no power to overrule a DCYF decision to terminate an employee who had unsupervised control over juveniles after he was convicted for violent crimes): State of R.I. Dept. of MentalHealth, Retardation and Hospitals v. R.I. Council 94,692 A.2d 318 (R.I. 1997) (the court held a department's ability to establish a cap on the maximum number of consecutive hours for state healthcare employees who work with custodial patients was not arbitrable because it conflicted with the director's statutory duty to provide for the safety and welfare of the agency's patients). Consequently, the State argues that an issue involving the manner in which the directors of DCYF and DOC operate their respective agencies is not arbitrable.
Conversely, the Union argues that the State's claim of statutory management rights precluding arbitration would result in an overriding of the Collective Bargaining Statue. See G.L. § 36-11-1 et seq. In effect the State's theory, the Union urges, would nullify not only the present agreement before the court, but also most other collective bargaining agreements entered into by the State which are negotiated pursuant to the legislatively granted right of state employees "to organize and designate representatives of their own choosing for the purpose of collective bargaining with respect to wages, hours, and other conditions of employment. G.L. § 36-11-1(a). Specifically, the Union argues that to construe broadly worded statutorily enacted management rights in such a way as to preclude any review of all management hiring decisions would eliminate the Union's statutory rights to engage in good faith collective bargaining over employment terms and conditions. Acknowledging the statutory, as well as contractual management obligations and duties of the department directors, the Union points out that the State did, in fact, agree in Article XXXI of the CBA to limit its freedom to replace bargaining unit employees with temporary help and that such a limitation, it contends, is not contrary to state law. The Union argues, and the arbitrator below concurred, that the Rhode Island Supreme Court decisions which have denied the arbitrability of certain management decisions are distinguishable from the dispute herein in that those decisions involve a director's statutory management authority, notwithstanding any CBA, in labor disputes involving critical, core governmental functions.
It is the opinion of this Court that the arbitrator was correct in determining that the labor dispute between these parties is the proper subject matter of arbitration. But for the State's jurisdictional contention, neither side seriously contests that this dispute involving the hiring of temporary employees is a grievance otherwise within the meaning of the CBA provisions. Each side's respective interpretation of the CBA's Article 31.1 governing the State's right to subcontract for clerical services created a conflict which triggered the grievance procedure detailed in Article 26.1 and which allowed any unresolved disputed to be settled by an Article 27.1 binding arbitration process. In considering the State's argument of a jurisdictional bar, the Court agrees with the arbitrator that the cases cited by the State to support its proposition are distinguishable. Whereas this Court does not dispute, as our Supreme Court has stated, that "there may be some limitations on a CBA to supercede statutes in certain critical areas such as the obligation of the director of corrections to require overtime services under emergent conditions. . . ." State of R.I. Dept. of MentalHealth, Retardation and Hospitals, 692 A.2d at 324 (citing R.I.Bhd. of Corr. Officers v. Rhode Island, 643 A.2d 817, 821 (R.I. 1994)) that case, unlike here, involved crucial and vital health and safety issues for that agency. Similarly, in WoonsocketTeachers' Guild, Local 951, Supra, wherein the court found the school board under a statutory duty to provide health services to students and in State of R.I. Dep't of Children, Youth Families, Supra, wherein the court found DCYF under a statutory duty to promote, safeguard and protect the social well-being and development of children, those cases evolved around safety and welfare issues. Moreover, the Court's findings in State of R.I. Dept. of Mental Health, Retardation andHospitals, Supra, that the department was statutorily obligated to provide for the safety and welfare of disabled, custodial patients and for protection of the public's health was central to the court's no-arbitrability ruling. In this Court's opinion, the temporary hiring activity at issue here does not serve such a vital role as health or safety. The arbitrator found as fact, and this Court agrees, that the duties of clerical employees include greeting the public, answering the phone, typing correspondence and reports, making data entry, and performing related administrative support services. This job description does not carry the same weight of serving the immediate or emergent health, safety, or welfare needs of the individuals which each of these departments are meant to serve. Accordingly, the Court concludes that the arbitrator correctly decided that an arbitration hearing to interpret the disputed language of Article XXXI of the CBA does not interfere with the statutory authority of the DCYF and DOC directors. To rule otherwise would needlessly make meaningless the General Assembly's legislative intent to allow state employees to organize and enter into collective bargaining agreements with the State.
 WHETHER THE DETERMINATION OF ARBITRABILITY INFRINGES UPON THE DCYF OR DOC DIRECTORS ABILITY TO CONTRACT FOR SERVICES PURSUANT TO THE PURCHASING POWER ACT
In the alternative, the State argues that any exercise of subject matter jurisdiction by the arbitrator usurps the State's purchasing power to contract for incidental or necessary services provided by the Purchasing Power Act. See G.L. 1956 § 37-2-1et. seq. The State alleges the statute allows it to purchase and contract for services required by any department or agency.[3] According to the State, the contract with the temporary employment agency was to assist the DCYF and the DOC in meeting the growing workload demands not met because of limited annual budge appropriations affecting how many permanent employees the department directors can hire. The State contends that the arbitrator ignores factoring in whether the vacant clerical positions were approved or funded in interpreting that under Article 31.1 of the CBA the departments are obligated to avoid subcontracting by authorizing the departments to fill vacant positions with bargaining unit employees rather than temporary workers. This would limit how the directors may supplement their existing workforce in an effort to meet the functions and duties of their departments. The State also has issue with the arbitrator's method of determining whether the State violated Article 31.1 on the basis of whether a director's exercise of his statutory authority to supplement the workforce with temporary workers corresponded with a decrease in bargaining unit positions. By ignoring budgetary considerations, this method would also limit how a director fills a vacant position so he can meet statutory obligations of his position and department.
The Union's response is very similar to their previous counterargument that the State specifically agreed in Article XXXI of the CBA to limit its freedom to replace bargaining unit employees with temporary help, and to not recognize would result in a countermand of the Collective Bargaining Statute. Also, the Union contends the directors' authority is not interfered with because the decision to hire temporary employees is not made by the department directors, but is rather a direct result of the political process involved when legislative committees delay or deny the funding for permanent positions.
The Court agrees with the Union that were the Court to determine that arbitrabililty of this issue intrudes upon the directors' statutory authority to contract for services necessary and incidental to their functions and duties pursuant to the Purchasing Power Act and that such a conclusion would counteract the purpose of the Collective bargaining Act. The State agreed when it entered into the CBA that it was "subject to the provisions of this Agreement" in Article 4.1, including to limit subcontracting "insofar as practicable" in Article 31.1. Because entering into an agreement pursuant to the Purchasing Power Act means to enter into a contract for services, the State agreed to limit itself "insofar as practicable." See Sections 37-2-7(5),37-2-7(20). The terms the parties agreed to in the CBA cannot be ignored. They agreed in Article 26.1 that a grievance was appropriate when there was a dispute over the interpretation of terms with the CBA, and if the issue went unresolved, it could go to arbitration pursuant to Article 27.
 CONCLUSION
Accordingly, the Court holds that by the terms of the CBA subject matter jurisdiction did exist for this dispute to enter arbitration and the Union's motion to confirm the arbitration award is affirmed.
[1] Article 26.2 et seq. of the CBA provides for a detailed grievance procedure for the State and Union to follow. Article 27.1 of the CBA provides that "If a grievance is not settled under Article 26, such grievance shall, at the request of the Union, be referred to the American Arbitration Association in accordance with its rules then obtaining. The parties may mutually agree to an alternative method of arbitration."
[2] Article IV: Management Rights. 4.1 Subject to the terms and conditions of this Agreement, it is understood and agreed that the Appointing Authority or his/her designee shall have sole jurisdiction of the operation of his/her respective Department. For example, but not limited thereto, the employer shall have the exclusive rights subject to provisions of this Agreement and consistent with the applicable laws and regulations: . . . C. To maintain the efficiency of the operations entrusted to it; D. To determine the methods, means, and personnel by which such operations are to be conducted. . . . Article XXXI: Subcontracting Procedure. Article 31.1. The State shall continue to provide work for employees in the bargaining unit and shall avoid, insofar as practicable, the sub-contracting of work performed by employees in the bargaining unit. . . .
[3] The State Purchasing Act defines "contract" to mean "all types of agreements, including grants and orders, for the purchase of supplies services, construction or any other item. It shall include awards; contracts of a fixed-price, cost, cost-plus-a-fixed-fee, or incentive type; contracts providing for the issuance of job or task orders; leases letter contracts; purchase orders; and construction management contracts. It also includes supplemental agreements with respect to any of the foregoing. `Contract' does not include labor contracts with employees of state agencies." Section 37-2-7(5). "Contractors" are defined as "any person having a contract with a governmental body." Section 37-2-7(7). "Services" are defined as a "rendering, by a contractor, of its time and effort rather than the furnishing of a specific end product, other than reports which are merely incidental to the required performance of services. `Services' does not include labor contracts with employees of state agencies." Section 37-2-7-(20).