[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
On July 22, 2003, the City of Cranston ("City") laid off thirty-nine crossing guards as part of a comprehensive effort to stabilize the rapidly deteriorating fiscal condition of the State of Rhode Island's third largest City.[1] The crossing guards, through their union, Rhode Island Laborers' District Council ("Union"), challenged this lay-off as a violation of their collective bargaining agreement and arbitration of this matter ensued. Upon return of an arbitration decision favorable to the Union, the City seeks to vacate this arbitration award. Jurisdiction is pursuant to G.L. 1956 § 28-9-18.
 FACTS AND TRAVEL
The City and the Rhode Island Laborers' District Council, Local 1033 are parties to a collective bargaining agreement for the period July 1, 2001 through June 30, 2004 ("CBA"). The CBA contains the terms and conditions of employment of the City's crossing guards.
During the executory interval of the CBA, the fiscal condition of the City continued to deteriorate. In July 2002, the Rhode Island Auditor General, Ernest Almonte ("Almonte"), conducted an assessment of all aspects of the City's finances, and issued a report directing the City to take certain action to address its problems.[2] Among his recommendations, Almonte instructed the City to re-visit all existing collective bargaining agreements with its various labor unions in order to seek concessions from them to help stabilize the City's finances. It was in this context that the City and Local 1033 agreed to begin concession bargaining of previously-negotiated provisions of the CBA.
At the conclusion of that "concession bargaining," John O'Leary, the former mayor of the City, and the Union executed a second agreement, entitled, "Tentative Agreement Between the City of Cranston, Rhode Island and R.I. Laborers' District Council on Behalf of Local Union 1033 of the Laborers' International Union of North America, AFL-CIO," with an effective date from July 1, 2002 through June 30, 2005 ("Tentative Agreement"). In addition to extending the length of the CBA from three years to four years, the Tentative Agreement also purported to amend several provisions contained therein. Most significantly to the current dispute, Article I of the CBA, entitled, `Union Recognition and Management Rights," was amended by adding thereto a new section (section 4), which provides:
 "Notwithstanding the language of Article I, Section 3, the City agrees for the life of this collective bargaining agreement (July 1, 2002 through June 30, 2005), not to layoff or furlough any bargaining unit member and further agrees to maintain not less than thirty-nine (39) crossing posts staffed by 39 bargaining unit employees. This provision will "sunset" at the completion of this three (3) year agreement (i.e. June 30, 2005) and the provisions of the prior contract regarding layoffs, furloughs and staffing will be reinstated."
Section 4 is commonly referred to as a No Restructuring Clause.
In January 2003, Mayor O'Leary left office and was replaced by the administration of Mayor Stephen Laffey. Upon taking office, in discharge of his duties under § 5.05 of the City Charter ("Charter"), Mayor Laffey requested that the Union return to the bargaining table to renegotiate the terms of the CBA. Paul Grimes, Director of Administration for the City, testified that while the City was engaged in concession bargaining with the Union, it was also engaged in a search for alternatives to provide crossing guard services in the City. Grimes stated that, as a result of that search, the City identified a private contractor capable of delivering significantly expanded crossing guard services for approximately one-quarter of the cost of the existing municipal program.
The concession bargaining between the City and the Union proved to be unproductive. Shortly thereafter, the City Council began the process of adopting a budget for the upcoming year. In that process, the City Council concluded that the City could no longer afford to maintain the City-run crossing guards program. The City Council then voted unanimously to provide no funding for the crossing guards program in its budget, which was formally adopted in June 2003. Accordingly, on July 22, 2003, the City sent layoff notices to each of the crossing guards, advising them that their positions had been eliminated by the City, and advising them of their right to obtain continuation health insurance coverage through COBRA.
On July 24, 2003, Local 1033 filed a class action grievance ("Grievance") over the layoff of all the crossing guards, alleging that the elimination of those positions violated the CBA. The Grievance was denied at all levels by the City, and the Union demanded that the dispute be submitted to binding arbitration, pursuant to the grievance and arbitration procedures contained in the CBA.
While the Grievance was pending, the Union also filed a complaint initiating litigation in the Superior Court on July 30, 2003, also alleging that the City's layoff of the crossing guards violated the CBA. On September 5, 2003, the Formal and Special Cause justice issued a "Permanent Injunction," in which he enjoined the City "and all persons acting in concert with said Defendants and each of them are restrained from laying off or furloughing any bargaining unit employee and from failing to maintain less than thirtynine (39) crossing posts staffed by 39 bargaining unit employees."
The Formal and Special Cause justice's action in that case was appealed by the City to the Rhode Island Supreme Court. Meanwhile, the Grievance proceeded to the arbitration hearing before Arbitrator Altman on February 10, 2004. The Supreme Court, after a conference held on February 24, 2004, issued an Order deferring action on the City's appeal pending Arbitrator Altman's Decision and Award in this matter.
On May 7, 2004, the Altman Award issued. The parties then attended a second conference with Justice Flanders of the Supreme Court regarding the City's appeal from the Superior Court's issuance of the September 5, 2003 injunction. After conferring with the parties, the Supreme Court issued an Order on September 25, 2004 holding the appeal in abeyance pending the ruling of the Superior Court in this action to vacate the Altman Award.
In his award, Arbitrator Altman determined that, under the terms of the CBA, the Union's grievance regarding the effect of the No Restructuring Clause was subject to the grievance arbitration process. Arbitrator Altman also held that the CBA, as extended by the Tentative Agreement, did not constitute a four-year agreement in violation of Rhode Island law. Finally, he found that neither applicable case law nor public policy precluded the enforcement of the No Restructuring Clause. Accordingly, he ruled that the issue was substantively arbitrable according to the terms of the CBA.
Arbitrator Altman then reviewed the terms of the No Restructuring Clause and opined that the lay-off of all crossing guards by the City had violated that provision. Based upon that alleged violation of the CBA, Arbitrator Altman then sustained the Grievance and declared that "[the City] is contractually barred from laying off employees for the duration of the [CBA]."
The City has filed a Complaint in the Nature of an Application pursuant to G.L. 1956 § 28-9-18 to vacate the arbitration award. This Court subsequently entered an Order setting a briefing schedule and oral argument in the case.
 STANDARD OF REVIEW
Judicial authority to review or vacate an arbitration award is limited. Rhode Island Council 94, AFSCME, AFL-CIO v. State, 714 A.2d 584,587 (R.I. 1998). An arbitration award may be vacated when the arbitrator manifestly disregarded the law or the contract, or when the arbitration award was completely irrational. Prudential Property and CasualtyInsurance Co. v. Flynn, 687 A.2d 440, 442 (1996). As long as the award "draws its essence" from the contract and is based upon a "passably plausible" interpretation of the contract, it is within the arbitrator's authority, and not subject to vacation by the Court. Jacinto v. Egan,391 A.2d 1173 (R.I. 1978). Grounds for vacating an award are provided by statute in G.L. 1956 § 28-9-18.
 "(a) In any of the following cases the court must make an order vacating the award, upon the application of any party to the controversy which was arbitrated:
 (1) When the award was procured by fraud.
 (2) Where the arbitrator or arbitrators exceeded their powers, or so imperfectly executed them, that a mutual, final, and definite award upon the subject matter submitted was not made.
 (3) If there was no valid submission or contract, and the objection has been raised under the conditions set forth in § 28-9-13.
 (b) A motion to vacate, modify, or correct an arbitrator's award shall not be entertained by the court unless the award is first implemented by the party seeking its vacation, modification, or correction; provided, the court, upon sufficient cause shown, may order the stay of the award or any part of it upon circumstances and conditions which it may prescribe.
 c) If the motion to vacate, modify, or correct an arbitrator's award is denied, the moving party shall pay the costs and reasonable attorneys' fees of the prevailing party."
An arbitrator may exceed his or her powers, thereby requiring a court to vacate an arbitration award if that award fails to "draw its essence" from the collective bargaining agreement or is not based upon a "passably plausible" interpretation of the same. R.I. Brotherhood of CorrectionalOfficers, 707 A.2d at 1234. Therefore, a court may vacate an award where the arbitrator manifestly disregarded a contractual provision, reached an irrational result, R.I. Council 94, AFSCME, AFL-CIO, 714 A.2d at 588, disregarded clear-cut contractual language, or attributed to the language "a meaning that is other than that which is plainly expressed." State v.R.I. Employment Security Alliance, Local 401, 840 A.2d 1093, 1096.
A party asserting that the arbitrator has exceeded his or her authority bears the burden of proving this contention. Coventry Teachers' Alliancev. Coventry Sch. Comm., 417 A.2d 886, 888 (R.I. 1980). In such a case, "every reasonable presumption in favor of the award will be made." Id.
Furthermore, "the statutory authority to vacate an arbitration award where the arbitrators exceeded their powers does not authorize a judicial re-examination of the relevant contractual provisions. State, Dep't ofMental Health, Retardation, and Hosps. v. R.I. Council 94, A.F.S.C.M.E.,AFL-CIO, 692 A.2d 318, 323 n. 11 (R.I. 1997) (internal quotations omitted).
 ARBITRABILITY
The City raises two grounds in support of its motion to vacate the arbitration award. The first addresses the question of arbitrability. The City argues that Arbitrator Altman had no authority to decide the present dispute, because under the terms of the CBA, the dispute is substantively non-arbitrable. It is the City's position that the No Restructuring Clause in the Tentative Agreement directly conflicts with the City Charter which grants the Mayor and the City Council the right to control the methods, means and process of government. Accordingly, the City contends that based upon the terms of the Cranston Charter, the Arbitrator did not possess the authority to enforce the No Restructuring Clause.
The Cranston Charter contains two provisions that discuss the city's and the mayor's powers and duties with respect to City organizations. Those provisions provide as follows:
 "Sec. 3.16. Powers over organization of the city government.
 The council shall have power by ordinance not inconsistent with other provisions of the Charter to create, modify or abolish departments and nondepartmental agencies in addition to those provided for in this Charter; and to create, modify or abolish within department[,] divisions and bureaus and other organizational units not established by this Charter. . . ."
 "Sec. 5.05. Flexibility in administrative organization.
 It shall be the duty of the mayor to carry on continuing studies of the operation of the city government as organized under this Charter and to recommend to the council for its action under section 3.16 measures assigning and reassigning functions and activities not specifically assigned by this Charter as between departments, divisions or other administrative units; creating, abolishing or recreating divisions and other units below the department level; and creating, abolishing or recreating departments for the administration of functions and activities not definitely assigned to departments by this Charter."
Based on the clear and unambiguous language of the aforementioned provisions, the city council, in accordance with the mayor's recommendation, possesses the authority to modify and abolish city organizational units. Furthermore, according to the plain and unequivocal language of Section 5.05, the Mayor has a duty to the City to suggest modifications to organizational units that he believes will be beneficial for the City.
In contrast to the Charter, the No Restructuring Clause in the Tentative Agreement effectively precludes the City and the Mayor from exercising its powers to modify or abolish the crossing guard organizational unit for a three year period. The question for this Court to determine is whether an arbitrator could legally enforce the No Restructuring Clause against the Mayor and the City, despite the fact that the clause is in clear conflict with the City Charter. This Court finds that an arbitrator has no such authority.
It is well established that "an arbitrator is `powerless to arbitrate that which is not arbitrable in the first place.'" State Dep't ofChildren, Youth and Families v. Rhode Island Council 94, 713 A.2d 1250,1253 (R.I. 1998), (quoting Rhode Island Bhd. Of Correctional Officers v.State, 707 A.2d 1229, 1234 (R.I. 1998). The Rhode Island Supreme Court has declared that a court's determination,
 "`of whether a dispute is arbitrable concerns a question of law and is subject to a broader standard of review than is the arbitrator's decision on the merits . . . Courts should not equate the issue of arbitrability with the deference due the arbitrator's interpretation of the contract. . . . Rather, a reviewing court must decide the question of arbitrability de novo.'" Dep't of Mental Health, Retardation, Hospitals v. Rhode Island Council 94, 692 A.2d 318, 323 (R.I. 1997) (quoting Providence Teachers' Union, Local 958 — Am. Fed'n of Teachers v. Providence Sch. Comm., 433 A.2d 202, 205 (R.I. 1981).
Additionally, our Supreme Court has consistently held that contract provisions that directly conflict with Rhode Island statutory law are both unenforceable and nonarbitrable. In State of Rhode Island v. Rhode IslandAlliance of Soc. Sec. Employees, Local 580, SEIU, 747 A.2d 465 (R.I. 2000), the Court stated:
 "[Rhode Island] cases in this area all boil down to a fundamental proposition: applicable state employment law trumps contrary contract provisions, contrary practices of the parties, and contrary arbitration awards. Thus, if a statute contains or provides for nondelegable and/or nonmodifiable duties, rights, and/or obligations, then neither contractual provisions nor purported past practices nor arbitration awards that would alter those mandates are enforceable. For this reason, labor disputes and grievances that seek to modify applicable state laws are not subject to arbitration because the arbitrator has no power to do so even if the parties to a CBA have agreed to such a modification or have conducted themselves in a way that contravenes what applicable state law requires."
The Court went on to declare:
 "neither a department of state government nor a union of its employees — let alone an arbitrator — can agree to relieve the parties to a CBA of their obligation to comply with applicable state law because of an inconsistent CBA provision or a contrary past practice of the parties. Indeed the parties to a CBA have no legal authority to contravene state law by word or deed."
Moreover, our Supreme Court has held that a municipal charter "has the force and effect of state law." Town of West Warwick v. Local 2045,Council 94, 714 A.2d 613 (R.I. 1998). "The provisions of a town charter are the organic law of the town with respect to municipal affairs."Borromeo v. Personnel Board of the Town of Bristol, 367 A.2d 711, 713
(R.I. 1977) (citing 56 Am. Jur.2d Municipal Corporations § 127 (1971)).
In the present case, the Mayor and the City acted within the authority conferred by the Cranston Charter provisions in making the executive decision to lay-off the crossing guards. Furthermore, it is apparent that under the Charter, the Mayor had a duty to the City to recommend this change once he found out that eliminating the crossing guards program would mitigate the City's financial crisis. Here, the City presented undisputed evidence that a private contractor could offer improved crossing guard services for one-quarter of the cost of the existing municipal program. Based on these findings and the City's conclusion that it could no longer afford to maintain the existing municipal crossing guards program, the City voted unanimously to eliminate funding for the crossing guards program, in accordance with Section 3.16 of the City Charter. According to the Union's rationale, the City would be obligated to maintain the crossing guards programs, even if the City was in complete and total financial ruin, simply because the previous Mayor[3]
added a no layoff clause to the collective bargaining agreement between the parties. The clear language of Charter sections 3.16 and 5.05 empowers the City and Mayor to "modify or abolish" organizational units in City government. The City was confronted with enormous financial difficulties and a directive from the Auditor General to revisit all collective bargaining agreements in an effort to control this looming fiscal crisis. This Court cannot envision a more appropriate set of dire and unfortunate financial circumstances warranting the exercise of the power conferred by the Charter. The parties to this CBA had no legal authority to contravene the explicit provisions of the Charter and therefore, this Court finds the union's position to be without merit.
Furthermore, the arbitrator's reliance on the Municipal Employees Arbitration Act in reaching its decision is misplaced. The Act grants employees the right to bargain collectively over "wages, hours, salary, working conditions and all other terms and conditions of employment." G.L. 1956 § 28-9.4-1. While there is no question that the MEAA endows employees and the City with the right to enter into collective bargaining agreements regarding terms of employment, it is clear to this Court that the MEAA does not deprive the City of its power to make executive decisions pursuant to specific charter provisions. In Town of WestWarwick v. Local 2045, 714 A.2d 613 (R.I. 1998), the Rhode Island Supreme Court held that the MEAA is a statute of general application and does not supercede a special statute in a Town Charter. Here, Sections 3.16 and 5.15 are specific provisions in the Cranston City Charter relating to the Mayor's and City's joint duties and powers with respect to city organizational units, and are tantamount to special statutes. Accordingly, the arbitrator's determination that the No Restructuring Clause is enforceable under MEAA is incorrect, as it blatantly ignores the controlling effect of the provisions in the Cranston Charter.
The City also argues that the Tentative Agreement is non-arbitrable because it violates the provision in the MEAA which provides that "no contract [may] exceed the term of three (3) years." Because the CBA contained an effective date from July 1, 2001 through June 30, 2004 and the Tentative Agreement purported to extend those terms through June 30, 2005, the City contends that the Tentative Agreement is void and therefore the No Restructuring Clause is automatically without effect. While the City is accurate in its assertion that a four year agreement would have violated the MEAA, here the parties did not enter into a four year agreement, but rather negotiated a new three year contract including some of the same terms as the 2001-2004 agreement. As there is no statute that prohibits public sector employees from reopening their contracts and making substantive changes, this Court finds the City's argument that that Tentative Agreement constitutes a four year contract in violation of MEAA to be without merit. Thus, although the No Restructuring Clause is non-arbitrable because it violates the Charter's provisions, the fact that the Tentative Agreement was extended has no impact on the Court's decision as to arbitrability.
 PUBLIC POLICY
The City's second basis for seeking vacation of the arbitration award is grounded in public policy. The City maintains that No Restructuring Clause contravenes public policy because it represents an abdication by the former administration of its nondelegable authority contained in the Charter to be exercised on behalf of all of the City's citizens.
The United States Supreme Court has emphatically stated that "a court may not enforce a collective bargaining agreement that is contrary to public policy." W.R. Grace and Co. v. Local Union 759, 461 U.S. 757, 766
(1983). The public policy at issue "must be well defined and dominant, and is to be ascertained `by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" Id.
(quoting Muschany v. United States, 324 U.S. 49, 66 (1945). Thus, inW.R, Grace Co. v. Local Union, the Supreme Court held that an arbitration award awarding back pay damages against a company for violating the seniority provisions in a collective bargaining agreement was not against public policy, even though the company's reason for violating the seniority provisions was for the purpose of complying with Title VII of the Civil Rights Act. 461 U.S. at 770. The Court reasoned that there was no public policy violated by holding the company to its collective bargaining agreement obligations. Id.
In contrast to the seniority provisions at issue in W.R. Grace, the No Restructuring Clause in the present case interferes with a special statute designed to protect the City's citizens from financial ruin. It is well-established that a contract in which one party agrees to violate a duty owed to a third party may not be enforced where the interests of the third party would be sacrificed. See, e.g., Restatement (Second) ofContracts § 193 cmt. a. (1981) (stating "A promise by a fiduciary to violate his duty as a fiduciary is unenforceable on grounds of public policy . . ."). See also Restatement of Contracts § 567 cmt. a. (1932) (explaining that a contract by a public official to refrain from performing a duty vested in him or her by law is illegal and unenforceable). Here, the party that would most suffer from the enforcement of the No Restructuring Clause would not be the former administration who entered into the collective bargaining obligations, but rather the citizens of Cranston who depend upon the Mayor and the City Council to make modifications to organizational units when needed. In this Court's view, the authority and duty vested in a City Council and Mayor under the special provisions of a City Charter to make decisions regarding the City's organizational units cannot be relinquished. In the instant case, the City, pursuant to its powers under the Cranston Charter, made the decision to abolish the crossing guard programs because the City could not afford to maintain the costly municipal crossing guards program. As previously stated, it is difficult to conceive of a more appropriate use of the powers and duties delegated to the Mayor and City Council in the Cranston Charter than during this time of severe financial instability. Accordingly, this Court finds that the No Restructuring Clause, in addition to being non-arbitrable, is adverse to the public interest and therefore void as against public policy.
 CONCLUSION
This Court finds that Sections 3.16 and 5.05 of the Cranston City Charter prevail over the No Restructuring Clause and arbitration award in this matter, thus rendering this dispute non-arbitrable. Furthermore, based upon the facts before it, this Court finds that the No Restructuring Clause is void as against public policy.
For the foregoing reasons, this Court grants Plaintiff's motion to vacate the arbitration award in this matter.
Council shall prepare a judgment for entry in conformity with this decision.
[1] Several articles in The Providence Journal demonstrate the fiscal crisis in the City of Cranston at the time the City made the decision to eliminate the crossing guards program. See, e.g.., Bruce Landis, Cranstonat bottom of fiscal survey, THE PROVIDENCE JOURNAL, Apr. 15, 2003, at http://pqasb.pqarchiver.com/projo; Scott Mayerowitz, Cranston FinancialCrisis — Get recovery legislation moving, says oversight chief, THE PROVIDENCE JOURNAL, Dec. 12, 2002, at http://pqasb.pqarchiver.com/projo.
[2] The report, entitled "City of Cranston Recommendations to Restore and Maintain Fiscal Stability," notes "that successful implementation of an overall recovery plan requires significant cooperation from many sectors" and that certain recommendations "may be difficult to achieve and will require compromise."
[3] This Mayor chose to not seek re-election at the conclusion of his term during which he assented to the clause at issue.